786 A.2d 13

**PLEASANTS INVESTMENTS LIMITED PARTNERSHIP et al.,**

v.

**State DEPARTMENT OF ASSESSMENTS AND TAXATION.**

No. 2684, Sept. Term, 2000.

Court of Special Appeals of Maryland.

Dec. 3, 2001.

Stephen J. Orens (Helen Lynn Primo and DuFour & Kohl-hoss, Chtd., on the brief,) Bethesda, for appellants.

Jeffrey G. Comen, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief,) Baltimore, for appellee.

Argued before KENNEY, LAWRENCE F. RODOWSKY, (Ret'd, specially assigned), RAYMOND G. THIEME, (Ret'd, specially assigned), JJ.

KENNEY, J.

This case arises out of the Tax Court's rejection of appellants' petition for planned development assessment of their respective properties under Md.Code Ann. (1986, 1993 Supp.), § 8–220 *et seq.* of the Tax Property Article ("TP").[1] Appellants raise one question on appeal:

> Whether the circuit court erred in interpreting § 8–221(2)(ii) of the Tax Property Article in contravention of the General Assembly's intent.

For the reasons following, we shall affirm.

## FACTUAL BACKGROUND

On June 25, 1993, appellants collectively filed an application with the State Department of Assessments and Taxation ("SDAT") seeking a planned development assessment ("PDA") for their properties, which are located in the Germantown West area of Montgomery County. A PDA permits "contigu-

---

1. There were eleven petitioners for the tax assessment, and all of them appear to be taking part in this appeal. The eleven petitioners are as follows: (1) Pleasants Investments Limited Partnership Properties, (2) Carol W. Mumma and Jean K. Phillips Properties, (3) William Parreco Properties, (4) Great Seneca Investments Properties, (5) Nationsbank of Virginia, N.A. Properties, (6) John N. Deoudes, M.S. Deoudes, Nicholas J. Deoudes, William J. Deoudes, and Thomas J. Deoudes Properties, (7) Clopper Realty Joint Venture Properties, (8) Michael I. Sanders, Trustee Properties, (9) Kenneth Y. Stiles, Trustee Properties, (10) N V Land, Inc., Elm Street Development, Inc. Properties, and (11) Chestnut Oaks L.C. Properties.

ous tracts of land of not less than 500 acres," TP § 8–221(3), to be assessed "at the rate equal to farm or agricultural land." TP § 8–222(b).

Appellants collectively own 660.67 acres of land (the "subject land"). The subject land is made up of 20 separate parcels of land owned by the different appellants. The various parcels are zoned R–200/TDR (Residential, Transferable Development Rights), R–90 (Residential, One Family), or PD (Planned Development). Montgomery County Code ("MCC") §§ 59–C–1.1; 59–C–7. Most of the subject land is zoned R–200/TDR or PD. A developer in the TDR zone must submit a subdivision and a site plan for approval but not a development plan. MGCC § 5–C–1.393. A developer in a PD zone must file a development plan with the district council as well as a site plan. MGCC § 59–D–1.1; MGCC § 59–D–1.2. In this case, each of the eleven property owners individually have filed the plans required for development within the zoning categories in which their respective properties are located.

SDAT denied the application for PDA, and appellants filed a timely appeal to the Property Tax Assessments Appeals Board for Montgomery County ("PTAAB"). PTAAB affirmed SDAT's decision, stating: "Lacking affirmative compelling evidence to support the granting of 'rates equal to farm or agricultural land' the Board must affirm the 1993 [SDAT] value of this large development in Germantown."

Appellants then appealed to the Tax Court. The Tax Court affirmed the PTAAB ruling, and appellants filed a petition for judicial review by the Circuit Court for Montgomery County. The circuit court initially remanded the case to the Tax Court for consideration of the criteria set out in TP § 8–221:

Land that is assessed [as agricultural land] under § 8–222 of this subtitle must:

(1) be located in an area shown on a current master plan or a general or regional plan, or otherwise designated for planned development by a plan adopted by the county or municipal corporation that has planning or zoning jurisdiction over the land;

(2) be zoned in a classification that:

(i) permits development only under the plans listed in item (1) of this section;

(ii) requires a land use and comprehensive site development or subdivision plan, approved before development by the county or municipal corporation that has planning or zoning jurisdiction over the land, if those plans consider:

1. land use;

2. utility requirements;

3. highway needs;

4. water and sewers;

5. industrial uses;

6. economic and job opportunities; and

7. recreation and civic life; and

(iii) requires the owner of the land to pay for or provide the following public facilities that are usually paid for or provided by a county or municipal corporation or a unit of the county or municipal corporation under other zoning classifications:

1. streets and roads;

2. walkways;

3. open spaces;

4. parks;

5. school sites; and

6. other property needed for public use;

(3) except for intervening rights-of-way, easements, or grants for public quasi-public uses, be contiguous tracts of land of not less than 500 acres owned by 1 or more persons; and

(4) be primarily undeveloped at the time the land is placed in the zoning classification.

On remand, the Tax Court again affirmed PTAAB's ruling, and appellants again petitioned for judicial review before the

circuit court. This time, the circuit court affirmed the Tax Court's ruling.

## DISCUSSION

### I.

Appellants argue that the circuit court interpreted the language of TP § 8–221(2)(ii) in contravention of the legislative intent. The legislative intent in creating the PDA assessment is set forth in the legislation:

(a) *Intent of General Assembly.*—The General Assembly states that it is in the public interest to provide for the development of lands in a planned manner.

(b) *Necessity for provisions.*—The development of lands in a planned manner is necessary to:

(1) obtain economic and environmental benefits;

(2) relieve economic pressures that result from the assessment of planned development land at levels inconsistent with planned development;

(3) aid the assembly of land for planned development land;

(4) facilitate cooperation among landowners; and

(5) permit holding of planned development land in an undeveloped status for orderly and staged improvement, particularly for the development of new communities.

TP § 8–220. To facilitate its intended goal of "orderly and staged improvement" of land "in a planned manner" the General Assembly alleviated some of the property tax burden of landowners who hold land to develop in an orderly and planned manner.

Appellants focus their argument on the following language from TP § 8–221(2)(ii):

(ii) requires a land use and comprehensive site development or subdivision plan, approved before development by the county or municipal corporation that has planning or zoning jurisdiction over the land.... [Emphasis supplied.]

SDAT argues that the meaning of "a" is plain and unambiguous and, for the property owners to qualify for a PDA, there must be a single land use plan for development of the entire 500 or more acres under consideration. SDAT also argues that, even if we were to look beyond the plain language of the statute, there is sufficient evidence in the statutory scheme as a whole that the General Assembly intended for "a" to mean "one."

### Standard of Review

[T]he final order of the Tax Court is subject to judicial review as provided in §§ 10–222 and 10–223 of the State Government Article, governing the standard of review for decisions of administrative agencies.

> "Under this standard, a reviewing court is under no statutory constraints in reversing a Tax Court order which is premised solely upon an erroneous conclusion of law. *See, e.g., Supervisor of Assess. v. Carroll,* 298 Md. 311, 469 A.2d 858 (1984); *Comptroller v. Mandel Re–Election Com.,* 280 Md. 575, 374 A.2d 1130 (1977). On the other hand, where the Tax Court's decision is based on a factual determination, and there is no error of law, the reviewing court may not reverse the Tax Court's order if substantial evidence of record supports the agency's decision."

*Supervisor of Assessments v. Keeler,* 362 Md. 198, 207, 764 A.2d 821 (2001)(quoting *Ramsay, Scarlett & Co. v. Comptroller of Treasury,* 302 Md. 825, 834, 490 A.2d 1296 (1985)).

The scope of our review is substantially the same as that of the circuit court. That is, we review the Tax Court's decision and not the decision of the circuit court. *Keeler,* 362 Md. at 207, 362 Md. 198. Moreover, we view the agency's decision "in a light most favorable to the agency, since 'decisions of administrative agencies are prima facie correct,' and 'carry with them the presumption of validity.'" *Keeler,* at 209, 764 A.2d 821 (citations omitted).

## The Tax Court's Ruling

The Tax Court affirmed the PTAAB decision denying appellants' application for the PDA, ruling, in pertinent part:

[T]he other requirement [in TPP § 8–221](2) be in that they be zoned in a classification that in particular [in subsection] ii requires a land use or comprehensive site development or subdivision plan. It seems to me the word "a" in there makes this singular is quite important [sic], especially when looked at in conjunction with 8–220 where the intent of the General Assembly as specified wherein that the special beneficial assessment that is Petitioner's request be granted only if this process or this benefit according to Number Four facilitates cooperation among landholders and Number Five permits holding of plan development land in an undeveloped status for orderly and staged improvement.

My interpretation of this single land user comprehensive site development is critical in that only if there is one land user site development plan can the process assure the cooperation among different land holders and a[n] orderly and staged improvement of the land. If, as in the case here, there's multiple landowners, each of which could and did file their own separate land use and site development plans, there is no legal way to implement cooperation between the landholders and no way to implement orderly and staged development. Each individual land use plan would have to be acted upon by the Park and Planning Process and while they can and do look at developments on adjoining parcels, there is no way that they can enforce total cooperation among the different parties nor can they enforce the orderly and staged development of the property. Clearly, that was the intent of the Legislature and it seems to me that that intent would require the singular or one land use or comprehensive plan.

The facts in this case are not disputed, and clearly the Tax Court based its decision on its interpretation of the statute.

## Rules of Statutory Construction

 In general terms, the rules of statutory construction are as follows:

The principles of statutory construction are not novel. "Every quest to discover and give effect to the objectives of the legislature begins with the text of the statute." If the legislature's intentions are evident from the text of the statute, our inquiry normally will cease and the plain meaning of the statute will govern. We bear in mind, however, that the plain-meaning rule is elastic, rather than cast in stone. If persuasive evidence exists outside the plain text of the statu[t]e, we do not turn a blind eye to it. We often look to the legislative history, an agency's interpretation of the statute, and other sources for a more complete understanding of what the General Assembly intended when it enacted particular legislation. In so doing, "we may also consider the particular problem or problems the legislature was addressing, and the objectives it sought to attain." This enables us to put the statute in controversy in its proper context and thereby avoid unreasonable or illogical results that defy common sense.

"We should first attempt to ascertain [the legislature's] intent from the statutory language, reading pertinent parts of the legislative language together, giving effect to all of those parts if we can, and rendering no part of the law surplusage."

*Adamson v. Correctional Med. Servs.*, 359 Md. 238, 251–52, 753 A.2d 501 (2000) (citations omitted).

 Although TP §§ 8–220 through 8–222 are not included in Tax Property Article Title VII, favorable tax treatment of land as agricultural land has been found by the Court of Appeals to be "essentially an exemption, and as such must be strictly construed." *Warlick v. Supervisor of Assessments*, 272 Md. 540, 545, 325 A.2d 587 (1974) (citing Md.Code (1957, 1969 Repl.Vol., 1973 Cum.Supp.), Art. 81, § 19, the precursor to the statute at issue in this case, as explained *infra*). When the construction of a tax exemption statute is at issue:

[I]t is well settled that tax-exemption statutes are to be strictly construed in favor of the taxing authority. In *Chesapeake and Potomac Telephone Company of Maryland v. Comptroller of the Treasury, Retail Sales Tax Division,* 317 Md. 3, 11, 561 A.2d 1034, 1038 (1989) (quoting *Xerox Corp. v. Comptroller,* 290 Md. 126, 137, 428 A.2d 1208, 1214–15 (1981)), this Court stated the rule thusly:

> "It is fundamental that statutory tax exemptions are strictly construed in favor of the taxing authority and if any real doubt exists as to the propriety of an exemption that doubt must be resolved in favor of the State. In other words, 'to doubt an exemption is to deny it'.... The State's taxing prerogative is never presumed to be relinquished and the abandonment of this power must be proved by the party asserting the exemption."

On the other hand, "[A] strict construction does not preclude a fair one. Rather it still contemplates a construction that effectuates the legislative intent and objectives; 'it does not require that an usual or unreasonable meaning be given to the words used in an exemption statute.' In other words, the rule of strict construction of tax exemptions does not call for strained or unreasonable construction to the extent of being adverse to the real legislative intention, for the judicial interpretation must always be in accordance with the actual meaning of the lawmaking power."

*Keeler,* 362 Md. at 209–210, 764 A.2d 821 (citations omitted). As we said in *Maryland–National Capital Park & Planning Comm'n v. State Dep't of Assessments & Taxation,* 110 Md. App. 677, 690, 678 A.2d 602 (1996), *aff'd,* 348 Md. 2, 702 A.2d 690 (1997) (citations omitted): "In the final analysis, the real legislative intent prevails. The burden of showing that an exemption is allowed under the law falls upon the claimant."

### Plain Language

Although it appears to us somewhat myopic, we turn to the substance of appellants' argument. They contend that the Tax Court's construction of the word "a" in the phrase "a land use and comprehensive site development or subdivision plan"

to mean "one" was in contravention of the legislative intent of the General Assembly. They argue that

Black's Law Dictionary, 6th edition, states that "[t]he article "a" is not necessarily a singular term; it is often used in the sense of "any" and is then applied to more than one individual objection .... "a" may mean one only where one is intended, or it may mean any one of a great number."

Thus, the letter "a" does not invariably as a matter of law mean "one."

At the risk of being drawn into a semantic whirlpool, we note that appellants fail to mention that the same edition of BLACK's defines "a" as follows:

The word "a" has varying meanings and uses. "A" means "one" or "any," but less emphatically than either. It may mean one where only one is intended, or it may mean any one of a great number. It is placed before nouns of the singular number, denoting an individual object or quality individualized.

BLACK'S LAW DICTIONARY 1 (6th ed.1990). Moreover, the portion of Black's cited by appellant also includes the following:

So under a statute providing that the issuance of "a" certificate to one carrier should not bar a certificate to another over the same route, a certificate could be granted to more than two carriers over the same route. Also, article "a" in statute making it a crime for a person to have in his possession a completed check with intent to defraud includes the plural. **But the meaning depends on context.** For example, in Workers' Compensation Act, on, or in or about "a" railway, factory, etc., was held not to mean any railway, factory, etc. but *the* railway, factory, etc., of the employer. Where the law requires the delivery of a copy of a notice to husband and a copy to wife, the sheriff's return that he had delivered "a copy" to husband and wife was insufficient.

BLACK'S LAW DICTIONARY 1 (6th ed.) (citations omitted, italics in original, bold text emphasis supplied).[2]

---

**2.** The Seventh Edition of BLACK'S LAW DICTIONARY contains no similar definitions of "a." BLACK'S LAW DICTIONARY 1 (7th ed.1999).

The OXFORD ENGLISH DICTIONARY defines the indefinite article "a," as follows:

*A* is strictly *adjective* and can only be used with a substantive following. Meanings:—

1. One, some, any: the oneness or indefiniteness, being implied rather than asserted. It is especially used in first introducing an object to notice, which object, after being introduced by *a,* is kept in view by *the;* as 'I plucked *a* flower; this is *the* flower.' Used before a noun singular, and its attributes.

OXFORD ENGLISH DICTIONARY 4 (2d ed.1989) (italics in original).

Finally, Webster's defines the indefinite article "a" as follows:

3 **a:** ONE <swords all of *a* length> <men all of *a* sort> **b**—used as a function word to suggest limitation in number <with only *a* brigade to defend the fort> **c:** the same <birds of *a* feather> 4 **a:** a particular illustration of: an example of (a named class) <he is *a* man> **b**—used as a function word before a singular noun followed by a restrictive clause or other identifying modifier <*a* man who was here yesterday> **c:** ANY, EACH—used with a following restrictive modifier <*a* man guilty of kidnaping wins scant sympathy> <*a* man who is sick can't work well>

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1 (1976) (italics and bold typeface in original).

The foregoing dictionary definitions simply indicate that the indefinite article "a" is implied to mean "one" or "each," **subject to context.** Here, the relevant context is "land that is assessed [PDA] must ... be zoned in a classification that ... requires a land use and comprehensive site development or subdivision plan, approved before development by the county or municipal corporation that has planning or zoning jurisdiction over the land, if those plans consider" land use, utility infrastructure, highways, and other development factors. In this context, "land" means all the land assembled for the PDA, which must be at least 500 acres of contiguous land, and

requires that "land" to be zoned in a classification that requires either an approved comprehensive site development plan or subdivision plan to develop the land.

Appellants, at oral argument, cited cases not cited in their briefs in favor of their contention that in this case "a" means more than one.[3] We will discuss two of them briefly. In *Lewis v. Spies*, 43 A.D.2d 714, 715, 350 N.Y.S.2d 14 (1973), the court construed a restrictive covenant that contained language allowing the construction of "a private dwelling house or a part thereof and the outbuildings connected therewith." The defendant in the case wished to construct a private home on a portion of property he owned. The portion on which he wished to build was part of a larger parcel conveyed in 1904 by Garden City Company to Chase Mellon. Another portion of the property conveyed by the 1904 deed already contained a private home. The 1904 deed contained a number of covenants, including the following:

> "First: That the said premises shall not, nor shall any part thereof be used for any commercial or manufacturing trade or business or purposes or for any factory, shop, hotel, livery or boarding stable, lodging, tenement, boarding or apartment house, school, seminary, hospital, or other institution, and that no building or structure except *a private dwelling house or a part thereof and the outbuildings connected therewith* shall at any time be erected thereon, and that no structure at any time thereon shall be used hereafter for any purpose other than as a private dwelling house, except the necessary and proper stables and outbuildings connected or designed for use in connection with such dwelling house; but nothing herein contained shall be construed to prohibit the owner or tenant of any building on said land actually occupied by him or her primarily as a dwelling house, from pursuing or teaching the liberal arts, sciences or professions or from taking at any one time four

---

**3.** Based on the citation provided, we were unable to locate a third case.

or ·any less number of persons to board or lodge" (emphasis supplied).

*Lewis,* 43 A.D.2d at 715, 350 N.Y.S.2d 14.

The court reviewed twenty-three additional deeds by the common grantor, and found that all of them, unlike the subject property, specifically limited to either one or two the number of dwellings that could be constructed on the parcel. Construing the covenant in favor of the free use of the land, the court consequently found that in this instance "a" meant more than one. *Id.,* 43 A.D.2d at 716, 350 N.Y.S.2d 14. Here, we construe the statute strictly in favor of the State.

In *Lindley v. Murphy,* 387 Ill. 506, 56 N.E.2d 832 (1944), partners in a business had applied to the Illinois Department of Labor requesting a review of the "rate determination for the year 1943, under the Unemployment Compensation Act." Employers who had incurred liability for unemployment contributions in each of the years preceding the tax year 1943 were eligible for a reduction in the rate. The operating entity itself, a stock brokerage firm, had undergone changes in its composition since 1938, but the business conducted was the same. Appellants argued that the statute required the agency to "combine their employment experience with that of two predecessor partnerships so as to entitle them to a variable rate of contributions[.]" The Illinois Supreme Court agreed. As in *Lewis,* however, the court found that the statute at issue was "not a taxing statute" and construed the provision liberally. *Id.,* 56 N.E.2d at 835.

 Our belief that "a" in the context in which it is used means a single development plan, be it a site plan or a subdivision plan, for all of the land to be favorably assessed, is further supported by looking at the statutes as a whole. In TP § 8–220, for example, the General Assembly has provided a statement of the legislative intent. The phrases "aid the assembly of land for planned development" and "facilitate cooperation among landowners" lend support to the theory that "land" in TP § 8–221 means a parcel or combination of parcels of land that is to be treated as a single unit with an

overall development scheme even if the "land" is made up of multiple tracts or parcels of land for title purposes. To "assemble" means "to bring together (as in a particular place or for a particular purpose)." MERIAM WEBSTER'S COLLEGIATE DICTIONARY 69 (10th ed.2000). The statutory purpose behind the "assembly of land" is "planned development" of the land seeking the PDA. The statutory mechanism holding the assembled land together for development, and which forces landowner cooperation if the "land" is made up of tracts owned by different parties, is "a land use and comprehensive site development or subdivision plan" that covers all of the land to be assessed PDA.

Although the case involved the Agricultural Land Transfer Tax, this Court's recent decision in *Rouse–Fairwood Dev. Ltd. P'ship v. Supervisor of Assessments for Prince George's County,* 138 Md.App. 589, 773 A.2d 535 (2001), *cert. denied,* 365 Md. 475, 781 A.2d 780 (Sept. 14, 2001), is instructive. In that case, the appellant had acquired, in January 1990, three contiguous parcels of land totaling 1,508 acres. All of the parcels were used as sod farms and had the benefit of an agricultural use assessment. When Rouse acquired the land, it filed a "declaration of intent" with respect to each parcel, agreeing to maintain the agricultural use of the land for five years in order to maintain the favorable agricultural assessment. On May 3, 1993, Rouse successfully filed an application for a zoning map amendment, from R R (Rural Residential) to M–X–C (Mixed Use Community), a Planned Unit Development zoning category. The rezoning occurred less than five years after the purchase of the property, and the Supervisor of Assessments, finding that the property was subject to more intensive use under the new zoning, levied an Agricultural Land Transfer Tax ("Ag Tax") on the property and assessed penalties as required by law:

Under T.P. § 13–305(c)(2)(i), if a transferee fails to comply with the declaration of intent, or if the property fails to qualify during the five-year period for the agricultural use tax assessment under T.P. § 8–209, then the Ag Tax, plus a 10% penalty, is due on the "portion" of the land that fails to

satisfy the declaration of intent or qualify for agricultural use.

*Rouse–Fairwood,* 138 Md.App. at 595, 773 A.2d 535.

Rouse urged the court to treat the three parcels separately such that the tax would only be due on that portion of the land that permitted more intense development. This Court rejected that approach and upheld the Tax Court's treatment of the three parcels as one unitary parcel of land. *Rouse–Fairwood,* 138 Md.App. at 633, 773 A.2d 535. *See also Supervisor of Assessments of Baltimore County v. Keeler,* 362 Md. 198, 764 A.2d 821 (2001) (treating the entire church-owned parcel as a whole and extending a tax exemption for religious worship to the entire 27 acre parcel even though the church buildings would only occupy 7.5 acres of the parcel).

 Based on the plain language of the statute, we conclude that "a ... plan" in the context of TP § 822 means one approved plan, as required by applicable zoning regulations, that directs the development of all the land for which the PDA is sought. TP § 8–221(3). We find further support for this holding in the legislative history.

### Legislative History

TP §§ 8–220 and 8–221 as originally enacted read as follows:

(f) *Planned development lands.*—(1) The General Assembly hereby declares it to be in the general public interest to encourage and foster the development of lands in a planned manner, the assembly of lands for such development, cooperation of landowners, and the holding of lands for orderly and staged improvement in accordance with governmentally approved plans; particularly for the purposes of development of new towns, cities, or satellite cities.[4] In order to

---

4. The only one of these terms that is defined in the statute is "city" which "shall include an incorporated city, incorporated town, or incorporated village." Md.Code Ann. (1957, 1969 Repl.Vol.), Art. 81, § 2(10).

promote such development and obtain the economic and environmental advantages to be realized thereby and to facilitate the land assembly, cooperation among landowners, and the holding of land undeveloped for periods of time sufficient to permit such orderly and staged development, and to prevent premature development of such land caused by economic pressure resulting from assessment at a level incompatible with the holding, staging of development, and land owner cooperation for such planned purposes, such lands shall be assessed and taxed in accordance with this subsection.

(2) Lands to be assessed and taxed in accordance with this subsection shall be only those lands which meet the following criteria:

A. Situated in an area shown on a current master plan, a general or regional plan, or otherwise designated for development as a new town, city or satellite city, adopted by the governmental authority having planning or zoning jurisdiction thereover, and

B. Zoned in a zoning classification (i) permitting development only in compliance with plans referred to in subparagraph (2)-A above, (ii) requiring a land use plan, and a comprehensive site development or subdivision plan, both of which shall consider land use, utility requirements, highway needs, water and sewers, industrial use, economic and job opportunities, recreation and civic life and be approved prior to development by a governmental agency exercising planning functions, and (iii) requiring the owner or owners thereof to pay for or provide streets, roads, walkways, open spaces, parks, school sites, and other property needed for public use which facilities are normally paid for or provided by the political subdivision or an agency thereof under other zoning classifications, and

C. Consisting of a tract of contiguous (except for intervening rights-of-way, easements, or grants for public or quasi-public uses) tracts of land comprising not less

than five hundred (500) acres, in one or more ownerships, and

D. Primarily undeveloped at the time said land is placed in the said zoning classification.

Md.Code (1957, 1969 Repl.Vol.), Art. 81, § 19(f)(1) and (2).

This enactment followed years of deliberations concerning the tax assessment of agricultural land. For example, in its 1963 Report,[5] the Maryland Legislative Council Committee on Taxation and Fiscal Matters (the "Committee") stated:

Thus far, the Department of Assessments and Taxation has not been able to develop an objective definition of agricultural use which would enable the Department to administer the law in a manner intended by the constitutional amendment [giving preferential tax treatment to farmers whose land is used for bona fide farm purposes] and which would withstand a test in the courts. It is a most difficult undertaking to assure to the bona fide farmer this assessment benefit, and at the same time, leave no loophole for abuses by those who were not intended to receive the benefit. If such abuses are permitted, it amounts to a form of subsidization to builders and land speculators at the expense of the remaining property taxpayers who receive no such benefit.

1963 Report at 1.

Then, in 1966, the Senate, recognizing that "[c]ertain speculators and real estate operators who do not have a sincere interest in farming as an occupation have unfortunately·used the law as a device to avoid paying [property] taxes comparable to the normal tax rate of a particular area," requested the Committee to "review and study The Farm Assessment Law." S. Res. No. 58 (1966), reproduced in 1966 Report at 80.

During the 1967 legislative term, Senate Bill 123 was introduced, which would have added language to Art. 81, § 19(b) to

---

**5.** We will refer to this and subsequent Reports as "19__ Report," according to the year the Report was issued.

ensure that land assessed as agricultural land was in fact being used for agricultural purposes:

Notwithstanding any provisions of paragraph (A) of this subsection, lands in order to be assessed as farm or agricultural land under paragraph (A) are zoned only for single family residence use, or for any conservation or agricultural usage, and for no other use, but regardless of the applicable zoning, no lands which are subdivided into building lots in any recorded plat may be assessed under paragraph (A) as farm or agricultural lands.

1967 Report at 2. That bill was not acted upon, but the Committee concluded that "the proposed legislation will strengthen and improve the purpose of the Farm Assessment Law and recommends its adoption." 1967 Report at 2 (footnote omitted).

In 1968, a bill was introduced and was passed by the General Assembly,[6] but vetoed by then-Governor Spiro T. Agnew. He provided the following reasoning in his veto letter:

In examining the effect this bill would have, the problem must not be viewed from the narrow base of additional revenue which could be derived from increased assessments, but with a glance toward the future development and welfare of the entire state. The greatest problem facing us all today is that of the urban areas, the vast cities that become more impacted by the day. The only feasible orderly development of newly populated areas in a manner that will allow people to live, work and thrive in surroundings which will not turn into the slums of tomorrow [sic]. The capital to plan, develop, build and maintain such population centers must be from private, not public, sources. This is so not only because of the great burden now being placed on public resources, but because it is the heart of our economic system, a system which we must encourage to tackle this

---

**6.** An exact copy of Senate Bill 1 as adopted by the General Assembly has not been located and such records were generally not kept at that time.

problem or face a continuing cycle of decay in our urban areas.

There are those who take advantage of the preferential assessment, and of this we are all aware. It was not intended for those other than bona fide farmers, but no one can deny that the preferential treatment has been instrumental in allowing the development of new cities and planned communities within our state. Cities do not spring up overnight. Communities are not created in a matter of days. Sewerage, water and educational facilities do not appear the moment land is rezoned. Roads and utilities equipment are not created as soon as land is sold for over seven times its assessed value.

The development of such communities requires vast capital outlays, years of planning, inventories of land and the adoption of master plans for zoning to provide for future land use compatible with the aims of a more orderly environment.

Government needs an even longer period than private investors to adequately provide the services and facilities essential to the success of orderly development. The financial commitment necessary cannot be made until the land is zoned and the planned use is imminent. The bill at one point included provisions which would have recognized the above problems and provided for their consideration. Unfortunately, these were not included in the bill as adopted.

If no preferential assessment is available to those interested in new cities and communities while the land is being held pending the completion of all necessary preliminary arrangements, in all likelihood the process of acquiring and holding land in large blocks will become so expensive that efforts in this direction will come to a standstill. But the lack of preferential treatment will not inhibit the speculator, who is interested only in having his improvements erected and then getting out with his profit. He can still survive, since he does not hold great acreage of land for years at a time. The result will be the worse kind of haphazard

development devoid of the planning necessary for a large modern integrated community.

1968 Report at 198–99. Although the Committee recommended an override of the veto, 1968 Report at 198, there appears to have been no override. The next year the General Assembly enacted § 19(f) of Article 81, which contains the "safe harbor" provision allowing certain lands to be assessed as agricultural lands even though they ultimately were to be developed.

The provisions of § 19(f) at issue in this case were not amended until 1985,[7] when portions of Article 81 were recodified into the Tax Property Article. According to the Revisor's Note:

This section is new language derived without substantive change from former Art. 81, § 19(f)(2).

In the introductory language of this section, the former reference to the lands being "taxed" is deleted as superfluous.

In item (1) of this section, the reference to assessed for "planned development" is substituted for former reference to "development as a new town, city or satellite city", for clarity.

In items (1) and (2)(ii) of this section, the phrase "the county or municipal corporation" is substituted for the former phrases "governmental authority", and "governmental agency", respectively, for clarity. Similarly, in item (2)(iii) of this section, the phrase "county or municipal corporation" is substituted for the former phrase "political subdivision", for clarity.

1985 Md. Laws, Chap. 8, § 2 at 262. There have been no amendments to TP §§ 8–220 and 8–221 since 1985.

■ The legislative history and the stated intent of the General Assembly reflect a great concern over the haphazard development. The legislature allowed developers the benefit

---

7. An unrelated provision of § 19(f) was amended in 1981. *See* 1981 Md. Laws 1981, Chap. 808.

of a favorable property tax assessment in exchange for the orderly and staged development of larger tracts of land. The legislation encouraged large-scale development involving the assembling of contiguous tracts of land and cooperation among owners to develop the land and its necessary infrastructure, including, but not limited to, water, sewer, streets, schools, and recreational facilities, according to an overall plan of orderly and staged development. It follows that the property owner or owners who applied for the PDA had to both assemble sufficient land for such large-scale development and to have approved a plan to develop the land in an orderly fashion. In this case, the requisite acreage of contiguous tracts of land is available, but it has not been assembled for use in a large scale planned development as foreseen by the statute. Moreover, there is no assurance of cooperation or commitment to an overall plan of development for the 660.63 acres of land.

Rather, the different land owners have proposed their own individual development schemes in accordance with the zoning of their respective parcels. Although appellants claimed at oral argument that they were cooperating in the development of the land, the record reflects that their voluntary cooperation has been limited to their joint application for the PDA exemption. Any development "cooperation" would appear to be limited to such requirements as may be imposed on contiguous or nearby properties as part of the normal regulatory scheme for the development of land in Montgomery County.

Under this theory, any combination of contiguous properties totaling 500 undeveloped acres or more that is delineated on a master plan for planned development and zoned in a classification that requires development in accordance with that master or regional plan, after approval of a site plan or subdivision plan, would be eligible for the PDA even though the actual development would be directed by the owners of the various tracts of land subject only to the applicable land use requirements of the jurisdiction. If that was the type of planned development sought by the General Assembly, the requirement of an acreage threshold of 500 acres has little meaning.

Obviously, it is the assemblage of sufficient land that permits the type of overall planning for the entire site that the General Assembly sought to encourage. Although SDAT maintained before the Tax Court that the exemption was limited to "new town" development, it abandoned that position at oral argument. The use of the word "particularly" in § 8–220(b)(5) would suggest that the PDA is not limited to "new town" developments and, apparently, it has not been so limited by SDAT in its application of the statute. On the other hand, the acreage minimum supports SDAT's position that the exemption was for large developments under a common plan.

Appellants are not, of course, forbidden from developing their individual tracts of land in conformance with the local zoning laws. They argue, however, that "[t]here are no zoning classifications under the Montgomery County Zoning Ordinance that contemplate development 'in a planned manner' which mandate the submission of a single site plan or a single subdivision plan encompassing an entire development project." We disagree and note that overlay zones are available in Montgomery County, which "provides regulations and standards that are necessary to achieve the planning goals and objectives for development or redevelopment of an area. Overlay zones provide uniform comprehensive development regulations for an area." *See* MGCC § 59–C–18.1 *et seq.*

Appellants appeared to contend at oral argument that, because the current zoning of these respective properties does not require or allow for the sort of development plans or subdivision plans foreseen by the statute, they should be excused from compliance. We are not persuaded. A PDA is not a matter of right. If appellants do not achieve the necessary zoning or otherwise meet the criteria of the statute, they simply do not reap the benefits of the PDA.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**