INSURANCE COMMISSIONER OF the STATE OF DELAWARE, Appellee Below, Appellant,

v.

SUN LIFE ASSURANCE COMPANY OF CANADA (U.S.), a Delaware domestic life insurance company, Appellant Below, Appellee.

No. 535, 2010.

Supreme Court of Delaware.

Submitted: April 13, 2011.
Decided: May 13, 2011.
Corrected: May 13, 2011.

Jennifer Davis Oliva, Esquire (argued) and James B. Ropp, Esquire, Department of Justice, Wilmington, Delaware; for Appellant.

Frances Gauthier, Esquire, of Stradley Ronon Stevens & Young LLP, Wilmington, Delaware; Of Counsel: Karl S. Myers, Esquire (argued) and Nancy L. Margolis, Esquire, of Stradley Ronon Stevens & Young LLP, Philadelphia, Pennsylvania; for Appellee.

Before HOLLAND, BERGER and JACOBS, Justices.

JACOBS, Justice:

At issue on this appeal is the meaning of the term "case," which appears in Section 702 of the Delaware Insurance Code.[1] Appellant-below, Sun Life Assurance Company of Canada (U.S.) ("Sun Life"), filed requests with appellee-below, Delaware Department of Insurance ("Department"), for refunds of taxes that Sun Life paid on premiums derived from certain life insurance policies, for tax years 2001 to 2003. The Delaware Insurance Commissioner ("Commissioner") denied Sun Life's request on the basis that Sun Life could not aggregate the premium income from those insurance polices into one unitary "case" for tax purposes under Section 702. On appeal, the Superior Court overturned the Commissioner's determination. Because we determine that the Commissioner properly interpreted the meaning of the statutory term "case," the judgment of the Superior Court must be reversed.

### FACTUAL AND PROCEDURAL BACKGROUND[2]

A. *Section 702(c)(2) and the 1998 Amendment*

In 1994, the Delaware General Assembly amended 18 *Del. C.* § 702, the general premium taxing statute that governs life insurance policies, by adding a new subsection (c)(2).[3] That new subsection created a declining tax rate schedule for companies issuing qualifying life insurance contracts in Delaware. An objective of that declining tax rate schedule was to facilitate Delaware securing a greater share of this tax revenue stream.[4]

Under subsection (c)(2), an insurance company's tax rate would be calculated based on the net premiums it received per "case" during each calendar year. As indicated below, the greater the net amount of premiums paid per case, the lower the insurance company's premium tax rate would be:[5]

| Net Premiums Per Case | Premium Tax Rate |
|---|---|
| First $10,000,000 | 2.0% |
| $10,000,001 to $24,999,999 | 1.5% |
| $25,000,000 to $99,999,999 | 1.25% |
| $100,000,000 and over | 1.0% |

As originally enacted, Section 702(c)(2) defined a "case" as:

all contracts issued to a *single* employer or trust established by a *single* employer or individual (or group of employers or individuals that participate in a *single* private placement under federal securities laws).[6]

In 1998, the General Assembly amended the definition of "case" in Section 702(c)(2). It did that by removing from the definition the word "single," and by moving the text that was previously in parenthesis into its own subpart. As a consequence, Section 702(c)(2) as amended, defines a "case" as:

a. All contracts issued to an employer, a trust established by an employer, or an individual, as appropriate; or

b. All contracts issued to all employers or trusts that participate in a private

---

1. 18 *Del. C.* § 702.

2. The facts are taken from the parties' Stipulation of Facts.

3. H.B. 615, 137th Gen. Assemb. (Del.1994); 69 DEL. LAWS, C. 462, § 7; *see also* 18 *Del. C.* § 702(c)(2) (1994) (amended 1998).

4. *See* H.B. 615, Synopsis.

5. 18 *Del. C.* § 702(c)(2) (1994). The General Assembly has never modified or amended the declining tax rate schedule since its enactment in 1994.

6. *Id.* (emphasis added).

placement under federal securities laws and/or purchase with respect to at least 25 lives policies covered by registrations under such laws.[7]

## B. *The Sun Life Insurance Policies*

Sun Life, a wholly-owned subsidiary of Sun Life Financial, Inc., is an insurance company incorporated in Delaware. Between 2000 and 2001, Sun Life issued seven employer-owned and trust-owned life insurance policies, as defined under 18 *Del. C.* §§ 2704(e)(3) and (e)(4).[8] Those seven policies were each issued through separate private placement memoranda.[9]

After issuing those seven policies, Sun Life filed with the Department its initial 2001 Premium Tax and Fees Report (the "Original 2001 Report"). Sun Life treated those policies as separate cases and did not claim any tax overpayment or refund.[10] Two years later, on February 25, 2003, Sun Life filed an amended 2001 Premium Tax and Fees Report (the "Amended 2001 Report"), which claimed a $661,141 overpayment of premium taxes and requested a refund in that amount. The reason for the overpayment, Sun Life explained, was that its Original 2001 Report incorrectly treated each employer/trust-owned life insurance contract as a separate "case," rather than treating all seven polices collectively as one unitary "case" under 18 *Del. C.* § 702(c)(2).

That scenario was repeated for Sun Life's 2002 and 2003 tax reports. In its initial 2002 Premium Tax and Fees Report (the "Original 2002 Report"), Sun Life claimed an overpayment, and requested a refund, of $1,473,804. Of that amount, $1,329,651 was not disputed by the Department. Two years later, in June 2004, Sun Life filed an amended 2002 Premium Tax and Fees Report (the "Amended 2002 Report"), wherein Sun Life reduced its requested refund to the undisputed $1,329,651 amount. After it received that refund in September 2004, Sun Life filed a second amended 2002 Premium Tax and Fees Report (the "Second Amended 2002 Report") in January 2005. In its Second Amended 2002 Report, Sun Life revised its requested refund amount to $144,153, which was the balance of the $1,473,804 claimed overpayment in its Original 2002 Report, less the $1,329,651 September 2004 refund. Again, Sun Life's explanation for the overpayment was that it had (erroneously) reported four employer/trust-owned life insurance contracts as one unitary "case." Based on that same rationale, Sun Life later filed its 2003 Premium Tax and Fees Report (the "2003 Report"), wherein it claimed an overpayment, and sought a refund, of $45,145.

Each of Sun Life's claimed overpayments was premised on its legal contention that under amended Section 702(c)(2), Sun Life may lawfully aggregate multiple employer/trust-owned life insurance policies

---

7.  18 *Del. C.* § 702(c)(2) (2011). In H.B. 426, § 1, the "a." and "b." separators are denoted as "(i)" and "(ii)." H.B. 426, § 1, 139th Gen. Assemb. (Del.1998).

8.  *See* 18 *Del. C.* § 2704(e)(3) (defining "employer owned life insurance policy"); 18 *Del. C.* § 2704(e)(4) (defining "trust owned life insurance policy").

9.  In the insurance context, the term "private placement" refers to the fact that an insurance policy is offered to investors privately and without formal securities registration, rather than through a public offering. *See, e.g.,* Lynnley Browning, *Tax–Free Life Insurance: An Untapped Investment for the Affluent,* N.Y. Times, Feb. 10, 2011, at F7, *available at* http://www.nytimes.com/2011/02/10/business/10PRIVATE.html (last visited May 11, 2011).

10.  *See* 18 Del. C. § 702(d) (setting forth time period for payment of premium taxes).

into one unitary "case." Sun Life claims that it overpaid taxes totaling $850,439 for tax years 2001, 2002, and 2003—an amount it claims that the Department should have, but did not, refund. That amount ($850,-439) is what is at stake in this litigation.

On July 26, 2005, an administrative hearing was held on Sun Life's refund claim. On November 25, 2008, the Commissioner held that Sun Life could not aggregate the premiums it received from the seven policies into one "case," because those policies were issued under separate private placements, not under "a" private placement as Section 702(c)(2)b requires.[11]

On appeal, the Superior Court reversed the Commissioner's determination. The court held that the 1998 amendment to Section 702(c)(2), which deleted the word "single" from the phrase "a single private placement," constituted a "material change" to the statutory definition of "case."[12] That material change, the court found, rendered the meaning of "case" ambiguous.[13] Because no clear legislative history evidenced the General Assembly's intent when it enacted the 1998 amendment, the Superior Court resolved the ambiguity in favor of the taxpayer, Sun Life.[14] The Department appeals from that ruling.

### ANALYSIS

■ Both parties agree that the outcome of this dispute turns on one legal issue: may Sun Life treat the seven employer/trust-owned life insurance policies as one unitary "case" under Section 702(c)(2)b? Specifically at issue is whether the statutory definition of "case" permits aggregating the premium income received from all insurance policies that an insurer (here, Sun Life) issues through separate and distinct private placements. Sun Life claims that even though all seven policies were issued through private, albeit separate, placements, they nonetheless constitute one "case" under Section 702(c)(2). The Department contends otherwise. It claims that under the statutory definition of "case," an insurer may aggregate into one "case" the premium income the insurer receives from all polices issued to all employers or trusts *only* if those policies were issued in the same private placement. But, premium income received from policies issued to different employers or trusts through separate private placements, as occurred here, cannot be aggregated so as to obtain the benefit of a lower tax rate. Because Sun Life's seven policies were issued through separate and unrelated private placements and not in one ("a") private placement offering, the Department urges, Sun Life may not aggregate the premiums derived from those policies for treatment as one unitary "case."

■ Our review of a decision of an administrative agency is limited to determining whether the agency's decision is supported by substantial evidence and is free from legal error.[15] Where, as here, "the issue is one of construction of statutory law and the application of the law to

11. Ins. Comm'r Final Findings of Fact, Conclusions of Law, and Order at 5 (Nov. 25, 2008) (holding that the plain meaning of the phrase "a private placement" is " 'one private placement,' not 'any private placement' [and] not 'all private placements.' ").

12. *Sun Life Assur. Co. of Canada (U.S.) v. Ins. Comm'r*, 2010 WL 2991584, at *4 (Del.Super.Ct. July 26, 2010).

13. *Id.* at *5.

14. *Id.* at *5–6.

15. *Stoltz Mgmt. Co., Inc. v. Consumer Affairs Bd.*, 616 A.2d 1205, 1208 (Del.1992), *see also* 29 *Del. C.* § 10142(d) (establishing standard of review for agency decisions).

undisputed facts," our review is plenary.[16]

▮▮▮▮ Delaware's rules of statutory construction are straightforward.[17] A court must first determine whether or not the statute is ambiguous.[18] If the statute is found to be clear and unambiguous, then the plain meaning of the statutory language controls.[19] "The fact that the parties disagree about the meaning of the statute does not create ambiguity."[20] Rather, a statute is ambiguous only if it is reasonably susceptible to different interpretations,[21] or "if a literal reading of the statute would lead to an unreasonable or absurd result not contemplated by the legislature."[22] When confronting an ambiguous statute, a court should construe it "in a way that will promote its apparent purpose and harmonize [it] with other statutes" within the statutory scheme.[23]

The original (1994) version of Section 702(c)(2) defined a "case" as "all contracts issued to a *single* employer or trust established by a *single* employer or individual (or group of employers or individuals that participate in a *single* private placement under federal securities laws)."[24] That statutory language was clear. The only correct interpretation of that language is that the premiums received from contracts issued to different employers through the same private placement may be aggregated into one "case," but premiums received from contracts issued through separate or different private placements may not be. Up to this point, the parties agree. Where they part company is on the question of whether the 1998 amendment to Section 702(c)(2) "materially" changed that plain meaning. We conclude that it did not.

## I. The Plain Meaning of Section 702(c)(2)b.

▮▮▮ Amended Section 702(c)(2), subsection b, defines a "case" as "[a]ll contracts issued to all employers or trusts that participate in a private placement under federal securities law...."[25] Although the statute does not define the phrase "*a* private placement,"[26] that term ("private placement") has a well-understood, specialized meaning in the financial and investment community. We must interpret that term in accordance with its specialized meaning.[27] As used in the statute, the term "private placement" is singular. That is, the term refers to an offer to sell securities not formally registered under the Securities Act of 1933[28] and the imple-

16. *Id.* (citing *E.I. du Pont de Nemours Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del.1985)).

17. *See Chase Alexa, LLC v. Kent Cnty. Levy Ct.*, 991 A.2d 1148, 1151 (Del.2010).

18. *Id.*

19. *Dir. of Revenue v. CNA Holdings, Inc.*, 818 A.2d 953, 957 (Del.2003).

20. *Chase Alexa*, 991 A.2d at 1151.

21. *Id.*

22. *Dir. of Revenue*, 818 A.2d at 957 (internal quotation marks and citation omitted).

23. *Eliason v. Englehart*, 733 A.2d 944, 946 (Del.1999).

24. 18 *Del. C.* § 702(c)(2) (1994) (emphasis added).

25. 18 *Del. C.* § 702(c)(2)b. (2011).

26. *Id.* (emphasis added).

27. 1 *Del. C.* § 303 ("Technical words and phrases ... shall be construed and understood to such peculiar and appropriate meaning.").

28. Securities Act of 1933, 48 Stat. 74, *codified at* 15 U.S.C. § 77a *et seq.*

menting Rules of the Securities and Exchange Commission.[29] Private placements typically are made to a small number of select private investors such as large banks, mutual funds, insurance companies, and pension funds.[30] The offer is formally made in a document commonly described as a "private placement memorandum."[31] Thus, by issuing its seven employer/trust-owned insurance policies to investors through separate private placement memoranda, Sun Life made seven distinct securities offerings, each offering corresponding to a separate insurance policy.[32]

Our determination that "private placement" has a specialized meaning leads to the next question: what is the significance of the article "a" appearing before the singular term "private placement?" Because there is nothing special or unique about the word "a," we must give that word its ordinary and common meaning.[33] Whether that meaning is singular or plural, however, will necessarily depend on the context in which the word "a" appears.[34]

Where the word "a" is followed by a singular noun that is a term of art (here, e.g., private placement), the resulting phrase can only refer to one event or item—i.e., "one private placement."[35] The context of that phrase within the statute requires that conclusion. In contrast, where a statutory phrase is intended to be plural (i.e., to reference more than one item), the statute uses the word "all" followed by a plural noun—e.g., "all contracts" and "all employers or trusts."[36]

---

29. See id. at §§ 3(b), 4(2); see also 17 C.F.R. § 230.501 et seq. (Regulation D).

30. See U.S. Dept. of the Treas., Comptroller of the Currency Admin. of Nat'l Banks, Comptroller's Handbook: Private Placements at 1, 5–6 (March 1990), available at http://www.occ.gov/static/publications/handbook/Private Place1.pdf; see also Investopedia, Private Placement, http://www.investopedia.com/terms/p/privateplacement.asp (last visited Apr. 26, 2011).

31. A sample private placement memorandum can be found at www.seclaw.com/docs/ref/sampleprivateplacementmemorandum.pdf (last visited May 2, 2011).

32. See Stipulation of Facts at 2–3.

33. LeVan v. Indep. Mall, Inc., 940 A.2d 929, 933 n. 14 (Del.2007) ("Undefined words in a statute must be given their ordinary, common meaning." (internal quotation marks and citation omitted)).

34. ION Geophysical Corp. v. Fletcher Int'l Ltd., 2010 WL 4378400, at *8 (Del.Ch. Nov. 5, 2010) ("The determination as to whether an indefinite article in a particular agreement is singular or plural, however, depends more on context than the laws of grammar.").

35. See, e.g., United States v. Hughley, 2005 WL 1202515, at *4 (E.D.Tenn. May 19, 2005) ("In the present case, the term 'a' means one."); Arnold v. Hoffer, 94 Conn.App. 53, 891 A.2d 63, 66–67 (2006) (interpreting "a detached dwelling house" in a restrictive covenant to impose a limitation on both the type and the number of houses that could be constructed on certain property); Farrington's Owners' Ass'n v. Conway Lake Resorts, Inc., 878 A.2d 504, 508 (Me.2005) (noting that one of two reasonable interpretations of "a dock" is a single dock); Pleasants Invs. Ltd. P'rship v. Dep't of Assessments & Taxation, 141 Md.App. 481, 786 A.2d 13, 19–22 (2001) (holding that " 'a' in the context in which it is used means a single development plan"); People v. Booker, 2009 WL 2382466, at *5 (Mich.Ct.App. Aug. 4, 2009), appeal denied, 485 Mich. 1100, 778 N.W.2d 221 (2010) (interpreting a Michigan statute which provided that "[a] defendant who allegedly has committed a crime ... shall be given a polygraph examination ... if [he] requests it" meant that the defendant could receive one and only one polygraph test upon request); Holladay Duplex Mgmt. Co. v. Howells, 47 P.3d 104, 106 (Utah Ct.App.2002) (concluding that the phrase "a one family dwelling house" meant one single family home).

36. See 18 Del. C. § 702(c)(2)b. (2011).

Read in context, the plain meaning of the phrase "a private placement" can only be *one* securities offering made through the issuance of *one* private placement memorandum. Accordingly, an insurer may aggregate into one "case" the premiums from all insurance contracts that are issued to all employers (or trusts) only if all of those contracts were offered in the same private placement memorandum.

Sun Life contends that the phrase "a private placement" means "any private placement." We disagree. Had the General Assembly intended to permit insurers to aggregate the premiums derived from all insurance contracts issued through separate private placement memoranda, then presumably that legislative body would have used the phrase "all private placements." The General Assembly did that elsewhere in the definition of "case" in Section 702(c)(2) where it employed the terminology "all contracts" and "all employers or trusts." But the Legislature did not use that form of expression with respect to private placements. Neither the original statutory language nor the amended language used the plural form. We view that choice as deliberate, and not as an oversight.[37] Accordingly, we decline to interpret the phrase "*a* private placement" to mean "*any* private placement."

### II. The 1998 Amendments to Section 702(c)(2) Do Not Constitute A "Material" or "Substantive" Change.

■ We also disagree with the Superior Court's conclusion that the 1998 amendments to Section 702(c)(2) constituted a "material" change which created an ambiguity that must be resolved in favor of the taxpayer. There is a "strong presumption" that alterations to statutory language do not effect a substantive change, unless "the new language in fact makes such a change in clear unambiguous terms."[38] Here, amended Section 702(c)(2) does not clearly and unambiguously demonstrate any intent to change the substantive law taxing insurance premiums. A plain reading of both the current statutory language and the original 1994 language discloses no material difference as between the two versions. There is no meaningful, substantive distinction between the phrase "a single private placement" and the phrase "a private placement." Both phrases express the same concept: "one private placement." The deletion of the word "single" from that phrase in 1998 did not alter its plain meaning. In the 1998 amendment, all instances of "single" were removed from the definition of "case" in Section 702(c)(2)—twice from the phrase "a single employer" in subsection a, and once from the phrase "a single private placement" in subsection b.[39] The synopsis to the 1998 amendment expressly states that that amendment made "technical and position changes" (as distinguished from substantive or material changes) to the 1994 version of Section 702(c)(2).[40] Nei-

---

**37.** *See* 2A SUTHERLAND, STATUTES AND STATUTORY CONSTRUCTION § 46:6 (7th ed. 2010) ("The use of different terms within similar statutes generally implies that different meanings were intended."); *see also Del. Solid Waste Auth. v. News–Journal Co.*, 480 A.2d 628, 634 (Del. 1984) ("[W]e note that the legislature could have used the term 'majority' or specified other circumstances constituting a 'meeting' [in drafting 29 *Del. C.* § 10002(e)], but did not do so.").

**38.** *Ahner v. Del. Alcoholic Bev. Control Comm'n.*, 237 A.2d 706, 708 (Del.1967) (citing *Monacelli v. Grimes*, 99 A.2d 255 (Del.1953)).

**39.** H.B. 426, § 1, 139th Gen. Assemb. (Del. 1998).

**40.** *Id.* at Synopsis; *see Hickman v. Parag*, 167 A.2d 225, 229 (Del.1961) (concluding that the legislature did not intend to change the meaning of a statute where there was nothing in the "legislative background" or in the "very

ther the statutory language nor the legislative history accompanying the 1998 amendment supports the Superior Court's finding that that amendment was intended to effect the material, substantive change in tax revenue reporting that Sun Life advocates.[41]

## CONCLUSION

We conclude that the plain meaning of Section 702(c)(2)b, both pre- and post-amendment, is that the premiums received from insurance polices may be aggregated into one "case" only if those polices were issued through the same private placement memorandum. Therefore, Sun Life may not aggregate the seven insurance polices that were issued via separate private placements into one "case." Accordingly, the judgment of the Superior Court is reversed.

---

limited change of language in this section [indicating] that the Legislature intended to make a change in [the statutory] meaning or that it in fact did so.").

41. As evidenced by its own conduct in reporting the taxes it owed, even Sun Life did not believe that the 1998 amendment constituted a material change. Sun Life's Original 2001 Report and Original 2002 Report listed the disputed insurance policies as separate "cases." Not until 2003—five years after the amendment was enacted—did Sun Life begin seeking refunds of tax overpayments by filing amended reports claiming that the disputed insurance policies should be aggregated into one "case." One would think that if, in fact, the 1998 amendment materially altered how Sun Life was to report its insurance policies taxes, that would have been clear at the outset, and Sun Life would not have filed its Original 2001 and 2002 Reports as it did.