REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1538

September Term, 2012

MICHAEL E. DONATI

v.

STATE OF MARYLAND

Matricciani,
Graeff,
Moylan, Charles E., Jr.
   (Retired, Specially Assigned),

JJ.

Opinion by Graeff, J.

Filed: January 29, 2014

A jury sitting in the Circuit Court for Montgomery County convicted appellant, Michael Donati, of one count of distribution of marijuana, two counts of obstruction of justice, two counts of making a false statement to a police officer, two counts of intimidating a witness, i.e., Jason Allen and Alex Zeppos, and fifteen counts of electronic mail harassment of Mr. Zeppos. The court sentenced appellant to a total of thirty-two years imprisonment.[1]

On appeal, appellant presents eight questions for our review, which we have rephrased slightly, as follows:

1.      Did the trial court abuse its discretion in admitting into evidence e-mails that were not properly authenticated?

2.      Was the evidence sufficient to support appellant's convictions for e-mail harassment?

3.      Do the convictions for e-mail harassment merge?

4.      Did the trial court abuse its discretion in restricting defense counsel's closing argument?

5.      Did the trial court err in admitting a letter seized during the execution of a search warrant on appellant's residence?

6.      Did the trial court err in permitting witnesses to identify appellant's voice on a 911 call?

7.      Did the trial court abuse its discretion in accepting Detective Heverly as an expert in digital forensic examinations?

---

[1] The court imposed the following consecutive sentences: four years for distribution of marijuana; two years for one of the obstruction of justice convictions and four years for the second obstruction of justice conviction; three years for each of the two witness intimidation convictions; six months each for the two convictions for giving a false statement to a police officer; and one year for each of the fifteen counts of e-mail harassment.

8.     Did the trial court err in denying appellant's motion for a new trial?

For the reasons set forth below, we shall affirm the judgments of the circuit court.

**FACTUAL AND PROCEDURAL BACKGROUND**

This case involves appellant's sustained attempts to harass and intimidate Mr. Zeppos, one of the owners of Growlers Pub ("Growlers") in Olde Towne Gaithersburg, and Mr. Allen, owner of the security company that had a contract with Growlers, after an incident that occurred at Growlers on April 10, 2011. Appellant had approached one of Mr. Allen's employees, Daniel Duncans, and offered to sell him marijuana. Mr. Allen removed appellant from the bar with the help of Mr. Duncans, Mr. Zeppos, and Growlers' chef, and Mr. Zeppos called the police. Mr. Allen alleged that, while he attempted to restrain appellant, appellant punched, bit, and pushed him.

Rodney Campbell, an officer with the Montgomery County Police Department, received a dispatch to respond to Growlers. When he arrived, he arrested appellant for CDS violations. Officer Campbell recovered, from the ground next to appellant, a large sandwich bag, which contained 10 smaller bags of marijuana, as well as three hand-rolled marijuana cigarettes. Appellant subsequently was charged with various offenses relating to this incident. Trial was set in the Circuit Court for Montgomery County for October 19, 2011, and Mr. Zeppos was scheduled to be a witness.

On April 20, 2011, Marcus Jones, a lieutenant with the Montgomery County Police Department,[2] received an e-mail forwarded from Commander Willie Parker-Loan, a captain with the Montgomery County Police. The e-mail was from Robert Fox, at "barsecurity123@gmail.com" and it alleged that someone in the Gaithersburg area was involved in growing and selling marijuana.

That same day, Darien Manley, Chief of the Maryland-National Capital Park Police ("MNCPP"), received an e-mail tip from Robert Fox, at "barsecurity123@gmail.com," regarding marijuana grow operations in Seneca Creek State Park and Black Hills Regional Park. He responded to the e-mail, stating that he would pass the information to an MNCPP investigator.

Chief Manley forwarded the e-mail to Detective Greg Worsey, a detective in the MNCPP Marijuana Eradication Unit. Detective Worsey and his partner, Detective Price, began an investigation. They walked through the parks, investigated locations where they had discovered grow operations in the past, and requested flight time with a National Guard helicopter that does flyovers to find suspected grow operations, but they did not find anything.

On April 23, 2011, at 2:25 a.m., a man who declined to identify himself called 911, stating that he would "like to report a drug dealer." The man reported that his neighbor on Sioux Lane, Mr. Allen, was selling drugs to individuals who drove to his house. The caller

_____

[2] By the time of trial, Lieutenant Jones had been promoted to the rank of Captain.

stated that Mr. Allen had "marijuana plants growing on the outside of his house on the steps . . . in gray pots," and Mr. Allen had put a bag on "the outside of his house on the steps, [into] black shoes." The caller further stated that Mr. Allen was growing marijuana in Seneca Creek State Park and Black Hills Regional Park, and there was fencing in Mr. Allen's yard that he used around plants.

At approximately that same time, Mark Norris, a detective with the Montgomery County Police Department who was off-duty at the time, drove down Sioux Lane in his unmarked car. He observed a dark colored, older model minivan sitting on Sioux Lane "partially blocking the roadway." Detective Norris was very familiar with the area, and he found the presence of the van unusual because people generally were not out in that area at that time of night. Detective Norris was aware that there had been increasing crime in the neighborhood, and in his experience, older model minivans often were used by burglars. Based on his concerns, he pulled up behind the van.

The driver of the van then pulled out and began to drive down Sioux Lane, going approximately 10 miles per hour. Detective Norris followed behind and then pulled over and turned his lights off. A few minutes later, he observed the van drive back down Sioux Lane at a slow rate of speed.

At that point, Officer Nicholas Jerman, who was training a rookie police officer, Gregory Hollis, drove down Sioux Lane in a marked police car. Detective Norris signaled him, told Officer Jerman about the van, and indicated that they should pull the driver over

to investigate. Officer Jerman stopped the vehicle, and Detective Norris pulled up three car lengths away.

Officer Hollis made contact with the driver of the van and asked him to step out of his vehicle. Both he and Officer Jerman identified appellant at trial as the driver of the van.

Officer Hollis asked appellant for his identification, and he asked appellant why he was in the neighborhood. Appellant responded that he was looking for something to eat. Officer Jerman noted that, "being in a neighborhood, you're not going to find a place to eat, unless you know somebody's house to go to." Officer Hollis observed a police scanner in appellant's car, which was tuned to the Sixth District channel for police radios.

After completing a field interview report and obtaining appellant's contact information, Officers Jerman and Hollis responded to the address on Sioux Lane referenced in the 911 call. Two other officers, John Ceresini and Rick Goodale, who had heard the detailed dispatch regarding the alleged activity at the house, also responded.

Officer Goodale observed a plastic bag in the driveway containing "a green leafy substance." Based on his training, he recognized the substance as marijuana. He also observed, consistent with the information from the 911 call, a pair of work boots on the front steps that contained a bag of marijuana. Officer Goodale then looked in the garden area by the front door and found two small live marijuana plants and a roll of green fencing.

Officer Goodale approached the front door to make contact with the homeowner. Based on the 911 call, he believed that the suspect was a white man, 5'7" to 5'8", named

Jason. The man who opened the door was a large black male; he stated that he was not Jason, but Jason was at home. As soon as the front door opened, Officer Goodale smelled a strong odor of marijuana coming from inside the house. The man who opened the door admitted that he had just smoked a joint. A man who identified himself as Jason Allen then came to the door, and Officer Goodale asked him to step outside.

Officer Goodale and the other police officers told Mr. Allen that they had received an anonymous call regarding his residence, and Officer Goodale showed him what they had observed in front of the house. Officer Goodale asked Mr. Allen if he would consent to a search of the residence, which Mr. Allen did. Officers Goodale and Hollis searched the residence and found no evidence of a marijuana grow operation or distribution. Officer Goodale explained that the police did not arrest Mr. Allen because, "based on what we found at the house, we did not believe that he was involved in any narcotics distribution or possession."

Before leaving the house, the officers asked Mr. Allen whether he had any ongoing disputes or issues with anyone, and Mr. Allen answered in the negative. They asked him whether he knew appellant. Mr. Allen expressed surprise at hearing appellant's name, stating that he did know him and explaining how.

After leaving Sioux Lane, Officers Jerman and Hollis went to the Emergency Communications Center ("ECC"), where the 911 dispatchers are located, and they listened to the tape of the earlier 911 call. They listened to the tape twice, a little more than an hour

after stopping appellant and speaking to him. At appellant's trial, Officer Hollis testified that appellant's voice was on the 911 call.

Officer Ceresini called ECC to determine the phone number used to make the 911 call. He subsequently determined that the call came from a pay phone in front of a Giant store. Officer Hollis reviewed the security footage from the Giant store parking lot and recognized the dark van as the one driven by appellant that he and Officer Jerman had stopped on Sioux Lane.

On April 23, 2011, Mr. Zeppos received an e-mail through the Growler's website, addressed to "Alex," from "The Don," at "pleasuredaddy123456@gmail.com." The e-mail read as follows:

> You[r] security staff are all dirty, Alex. That is why Jason was arrested yesterday, and the rest of them will be arrested soon enough. I would get rid of Dunkin, and the rest of them ASAP, and hire new staff. Distance yourself from them while you can. Hire staff that do not try to rough up the customers, because if you try to rough up the wrong one, you may have more problems than you would want, Alex. In fact, you're [sic] establishment may disappear over night. Then what would you do to make money?

On April 24, 2011, Mr. Zeppos received another communication from "pleasuredaddy123456@gmail.com." This e-mail, sent to his individual account, also referenced the incident at Mr. Allen's house and stated: "I also heard that the cops, and the IRS are looking at you really strong now because they think you are the organizer. You need to disassociate yourself from your security staff, and get some new people who will not get you busted, and put in jail, Alex."

-7-

On May 2, 2011, Chief Manley received an e-mail from "Mr. Tipster," at "mrtpstr83@gmail.com." The e-mail referenced the incident at Mr. Allen's home on April 23, 2011, alleging that Mr. Allen was selling drugs, and he was involved in a marijuana grow operation in Seneca Creek Park. That same day, Detective Worsey received an e-mail from "Mr. Tipster," at "mrtpstr83@gmail.com," that stated:

> We gave a tip to the officers of the 6th District of the Montgomery County Police on April 23rd. We know they responded to the residence of a fellow named Jason Allen. He is one of the growers, and more importantly is one of the marketers. He markets it in the Ga[i]thersburg club scene, and he works at [G]rowlers. Officers responded to the address on Sioux Lane in Gaithersburg, MD near Seneca Creek Park. He had plants growing in pots on his porch, and had just conducted a series of marijuana deals and was so high he dropped a bag on his driveway, and then dropped one in his black running shoes on his front porch on the outside of his house. He even has the plastic green deer fencing on his porch which he uses when he plants in the park. All the evidence was right there for the police.
>
> * * *
>
> If the officers of the 6th [D]istrict did not arrest Allen on the 23rd, I don't know why. There was marijuana everywhere. Simply everywhere. The plants on his porch were two he forgot to take to the park when he went out to plant that day.

On May 17, 2011, Theodore Vaughan, a police officer with the State Comptroller's Office, Field Enforcement Division, was assigned to investigate Growlers as a result of an e-mail sent to the Comptroller, who then forwarded the e-mail to the Field Enforcement Division. The initial e-mail complaint came from "Mr. Tipper," at the address "mrtipper008@gmail.com." The e-mail alleged that Growlers was selling untaxed alcoholic beverages and transporting untaxed cigarettes.

On May 19, 2011, Agent Vaughan conducted an inspection at Growlers, along with Agent David Hollingsworth. During their investigation, Agents Vaughan and Hollingsworth found no problems with alcohol or cigarette sales at Growlers.

On June 21, 2011, Agent Vaughan received an e-mail from "Mike," at "bourbonstband@gmail.com," which contained a link that purported to contain photos of marijuana growing operations for which "Zepo- the owner of Growlers" was responsible. The author of the e-mail stated that he got the pictures from Mr. Allen, who "directs the operation."

On June 22, 2011, Agent Vaughan received a second e-mail from bourbonstreetband@gmail.com, which also contained a link to photos of marijuana plants. Shortly thereafter, he received a third e-mail alleging that Growlers' employees were laundering illegal drug money through the restaurant.

As follow-up to the e-mails, Agent Vaughan called the complainant, who identified himself as Mike, and spoke to him about Growlers for approximately an hour. Agent Vaughan also forwarded the e-mails regarding marijuana grow operations in state parks to the MNCPP.

On August 15, 2011, Mr. Zeppos received an e-mail from "Mr. Tipper," at "mrtipper@yahoo.com," pertaining to the Agent Vaughan's visit to Growlers on May 19. The e-mail read as follows:

> I was in your club on Saturday, and I overheard the guys at the next table talking about the fact that they worked for the Maryland Comptrollers [sic]

Office located in Baltimore, MD. I did not pay much attention to the conversation until I heard one of them say that they would, **"Own the club after the audit is complete".** [sic] I am not sure what they were talking about, but thought you guys might want to know what I heard. I really do not know if I should be telling you this or not, or if I could get into trouble for doing so. You know how the IRS is. Only reason I am telling you this is because I visit you [sic] club weekly, and like [the] place.

On August 20, 2011, Detective Worsey was working in Black Hills Regional Park, in uniform, assisting with patrol and road coverage. Lieutenant Meixsell, an MNCPP patrol commander, received an e-mail advising that he would find evidence on the front door of the park manager's office, specifically a stem from a marijuana plant that was intended for Chief Manley. When Detective Worsey arrived at the office, he observed a three-foot long branch from the top of a marijuana plant hanging on a piece of brown twine.

On September 28, 2011, Lieutenant Jones received an e-mail from Clayton Thomas, III, at "cthomas03@hotmail.com," which stated that Growlers was "deeply involved in the drug trade," including "growing operations" and "selling it v.i.a. mail order." It also stated that Growlers "receive[s] marijuana shipments at the bar from growers in VA to blend with their marijuana grown in the County Parks."

Lieutenant Jones replied to the e-mail, expressing his interest in additional information. Mr. Thomas responded that he "could give you the tracking number of packages of drugs that Alex Zeppos - owner of Growlers - has shipped to him from Virginia to mix with his weed." He further stated: "I know that Darran [sic] Manley (Chief of Park

Police), and some people with the MCPD already know about Growlers' grow operation, and what goes on in the club. Why they haven't busted them is beyond me."

Lieutenant Jones continued to receive e-mails regarding a marijuana grow operation run through Growlers. He did not believe that the information regarding Growlers and Mr. Zeppos was legitimate information.

On September 30, 2011, Richard Grapes, a detective with the Montgomery County Police Department, received an e-mail from Mr. Essex, at "mr.essex@ymail.com," which stated that Growlers "receive[s] shipments of marijuana from a grow operation in Virginia, and blend[s] it with the Maryland Marijuana for taste." It cautioned that Detective Grapes would be remiss if he did not act on the information "like in the case of the Park Police." Later that day, Detective Grapes received another e-mail from Mr. Essex, stating that he would "be getting tracking numbers . . . pertaining to the marijuana shipments being sent to Alex Zeppos, and Jason Allen." Mr. Essex asserted that the shipments "are coming from Virginia, and while the two people just mentioned grow marijuana, the[y] blend it with what is being shipped."

On October 2, 2011, Mr. Essex sent an e-mail stating that he had provided Detective Grapes with information regarding the shipment from Virginia for free, but "[t]he latest info is not gratis." The e-mail stated:

> You will need to do something for me. Zeppos and his security gang get people in his club to approach customers, talk about weed, and if they show an interest he has them point out the guys who sell it (usually security guys). If they don't want to do it for Zeppos, he is usually pretty cool, and just says he

was joking. There was one fellow in April that he approached, but the guy did not want to sell . . . Zeppos had his security guys set him up. . . . The guy was charged. I was not there but my friend was, and everybody knows what happened, [Detective Grapes]. We all feel bad for the guy, and he goes to trial this month on the 19th for Possession with intent, and ass[]ault. . . . You will have a deal worked out with the State's Attorney saying that all charges will be dropped as soon as you find this grow. All parties will sign it, and it will be legally binding.

They call this guy who was busted Montana. Some people call him Mike.

Detective Grapes responded to Mr. Essex's e-mail, stating that he would look into a deal for Mr. Essex's friend, Mike. He testified that he was trying to gain more information from Mr. Essex and attempting to get Mr. Essex to continue to work with him.

On October 3, 2011, Mr. Essex sent an e-mail to Detective Grapes asserting that he "[j]ust got wind of a shipment going out tomorrow sometime. As soon as it does I will have some tracking numbers for you." They continued to exchange e-mails regarding the shipment, as well as Detective Grapes' efforts to reach a deal for Mr. Essex's friend.

On October 4, 2011, Mr. Essex sent an e-mail to Detective Grapes indicating that he would have a map of the grow operations for him later that day, and "[t]he guy working with me on this (i.e. mole) has been to the grows, and will mark it out with bright ribbon so you will not get lost."

Meanwhile, Detective Grapes and members of the Metropolitan Area Drug Task Force had been conducting surveillance of appellant, at appellant's residence and throughout Montgomery County. They began looking for appellant's maroon minivan, anticipating that appellant "would be in the process of being out in the woods marking a path with bright

-12-

ribbon." They spread out looking for his van, "in parks, highway ramps, park and rides," and other locations where they believed the grow might be located based on his e-mails.

Detective Grapes saw appellant's van parked across the street from appellant's house. He got out of his vehicle and walked past the van. On the floor of the van, Detective Grapes observed "a Home Depot bag that contained a new roll of bright marking tape." Detective Grapes alerted his team that he had located appellant's van, and they were to follow the van to see if appellant used the tape to mark grow operations.

Three minutes after Detective Grapes sent out the radio call to the task force, he received an e-mail from Mr. Essex stating that Mr. Zeppos had been tipped off, he could no longer work with Detective Grapes, and he would take his information "to the FEDs." Detective Grapes realized that the sender of the e-mails was monitoring the police radio. He then sent out a call over the radio stating that he "received an email, this wasn't going to work out, that we could go ahead and leave, and that I'd follow up on it later." He further stated that a tow truck would come and tow the van, and they would obtain a search warrant for it later. A few moments later, appellant left his residence and walked to his van, at which point Detective Grapes and other members of the task force placed him under arrest. Detective Grapes received no further e-mail communication from Mr. Essex.

After appellant's arrest, Detective Grapes obtained a warrant to search appellant's residence, which he and other members of the task force executed a few hours later. In a room in the basement, which was locked with a padlock, they found a desk with documents

and notepads. Included among the documents seized were three sheets of paper with numerous e-mail addresses listed on them. A sheet labeled "Special emails" included the following addresses: "taxman86@hotmail.com," "cthomas03@hotmail.com," "mr.essex@ymail.com," "ms.watcher@ymail.com," "jrkelly123@hotmail.com," "mr.yo_daddy@yahoo.com," "thebomb00769@yahoo.com," and "backdoor.greeky.greekyfinder@hotmail.com." A sheet labeled "Normal emails" included the following address: "bourbonstband@gmail.com."

The investigators also found a video camera, an electric cord, and a bag containing videotapes. One of the tapes, admitted into evidence as State's Exhibit 55, depicted a heating pad, "growth media" in the form of a "semi-clear plastic container," and bags of soil, items that Detective Grapes observed in the basement during the execution of the warrant. The tape contained a narration, which began as follows: "This is a short film. It will show you the (unintelligible) of getting your plants started, transplanting to outdoor areas, and constructing outdoor growing sites." The tape then depicted an outdoor area, which Detective Grapes identified as the backyard of appellant's house. Detective Grapes identified the voice on the tape as appellant's voice.

Investigators also seized a computer and other items from the home. William Heverly, the technical leader of the Montgomery County Police Department electronic crimes unit and an expert in digital forensic examination, examined the computer items. He determined that the computer was registered as "Bourbon St Band" and contained one user account named

"Montana."[3]  While searching the hard drive of appellant's computer, Detective Heverly found a series of e-mails between Mr. Essex, at "mr.essex@ymail.com," and Detective Grapes.  He also found a fragment of an e-mail from "Mr. Tipper" addressed to Chief Manley, as well as a Hotmail account for Mr. Tipper.

Mr. Zeppos testified regarding the series of e-mails that he received, beginning on April 23, 2011, directed to either his personal e-mail account or the Growlers account.  The e-mails escalated from "a little threatening" to "very threatening," and they contained personal attacks.  The last such e-mail he received was on October 3, 2011.

Jason Fair, appellant's former roommate, testified that he moved in with appellant in November 2010 and lived with him, appellant's wife, and three other roommates.  There were plants in the common areas of the home, including the kitchen, the living room, and the upstairs hallway.  Mr. Fair had never seen marijuana in the home, but on several occasions, appellant had asked Mr. Fair if he would like to smoke a joint with him.  Mr. Fair always declined due to his employment and his personal preference.

Mr. Fair's bedroom was on the main floor of the home, and he also used a portion of the basement to build model planes.  There was a small room in the basement that belonged to appellant, which contained computer equipment.  Mr. Fair had been in the room only when appellant invited him, and the door was kept locked with a padlock.  Appellant showed Mr. Fair photographs of marijuana grows on his computer, and he told Mr. Fair that "the

---

[3] The parties stipulated that appellant's nickname was Montana.

owner at Growlers was planting all that out there." Appellant further stated that "he knew where a lot of stuff was out there and, if they, the police, were smart enough, they would drop the charges against him and he could tell them where all the fields were at."

On October 4, 2011, when the police executed the search warrant for appellant's home, Mr. Fair went into appellant's basement room. He noticed that there was an additional room, of which he had not been aware. That room contained plants, "silver reflector shades," a humidifier, and potting materials. He also saw gardening equipment in the room, including a shovel and a rake, and he described the room as having an odor like a cat litter box.

Mr. Fair recalled that appellant had visited area parks for the purpose of tracking deer. When appellant went out to track deer, he would leave the house in full camouflage clothing and come back a few hours later. In addition to wearing camouflage pants, shirt or jacket, and boots, appellant also wore several pairs of gloves. On several occasions, Mr. Fair noticed that appellant wore cotton gloves under the camouflage gloves, and once appellant wore "a latex glove, a cotton glove, and then a regular glove."

Mr. Fair's rental agreement with appellant was set to expire in mid-October 2011, when he was scheduled to leave for a new construction job in Tennessee. Mr. Fair and appellant had discussions regarding the return of Mr. Fair's security deposit and prorating his remaining rent, but they initially reached an impasse. Appellant then proposed a solution to Mr. Fair; if Mr. Fair would mail a package for him, "it would be no problem getting [his] deposit and prorated moneys back." Appellant wanted Mr. Fair to mail the package on his

way to Tennessee in mid-October, requesting that he send it from Virginia and give appellant the tracking number. Appellant explained his request to Mr. Fair as follows: "He said it was tax reasons for his home business, it had to be mailed from Virginia." Mr. Fair told appellant that he had no interest in sending the package for him.

Additional facts will be discussed herein as necessary.

## DISCUSSION

## I.

## Admissibility of E-mails

Appellant's first contention is that the circuit court abused its discretion by admitting e-mails that were not properly authenticated. The Maryland appellate courts have addressed the authentication of other forms of electronically stored information, *see Griffin v. State*, 419 Md. 343, 358 (2011) (pages printed from a social networking site); *Dickens v. State*, 175 Md. App. 231, 239 (2007) (text messages), but the parties did not cite, and we did not find, a reported opinion in Maryland addressing specifically the authentication requirements for the admissibility of e-mail messages.[4] We shall address that issue in this case.

## A.

## Standard of Review

---

[4] In *Griffin v. State*, 419 Md. 343, 361 n.13 (2011), the Court of Appeals stated "that authentication concerns attendant to e-mails, instant messaging correspondence, and text messages differ significantly from those involving a MySpace profile and posting printout, because such correspondence[] is sent directly from one party to an intended recipient or recipients, rather than published for all to see."

Determinations regarding the admissibility of evidence are generally left to the sound discretion of the trial court. *Hajireen v. State*, 203 Md. App. 537, 552, *cert. denied*, 429 Md. 306 (2012). This Court reviews a trial court's evidentiary rulings for abuse of discretion. *State v. Simms*, 420 Md. 705, 724-25 (2011). A trial court abuses its discretion only when "'no reasonable person would take the view adopted by the [trial] court,'" or "when the court acts 'without reference to any guiding rules or principles.'" *King v. State*, 407 Md. 682, 697 (2009) (quoting *North v. North*, 102 Md. App. 1, 13 (1994)).

## B.

## Authentication Requirements

Maryland Rule 5-901 addresses the requirements to authenticate evidence, including electronically stored evidence. It provides as follows: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Md. Rule 5-901(a). Subsection (b) of Rule 9-501 provides examples of how to authenticate evidence. It states, in pertinent part, as follows:

> (b) **Illustrations.** By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this Rule:
> (1) Testimony of witness with knowledge. Testimony of a witness with knowledge that the offered evidence is what it is claimed to be.
>
> * * *
>
> (3) Comparison with authenticated specimens. Comparison by the court or an expert witness with specimens that have been authenticated.

-18-

(4) Circumstantial evidence. Circumstantial evidence, such as appearance, contents, substance, internal patterns, location, or other distinctive characteristics, that the offered evidence is what it is claimed to be.

* * *

(10) Methods provided by statute or rule. Any method of authentication or identification provided by statute or by these rules.

Rule 9-501(b), by its express language, which is derived from Federal Rule of Evidence 901, makes clear that the authentication methods listed in this Rule are not exhaustive. *See Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 544 (D. Md. 2007) ("the methods identified by Rule 901(b) are non-exclusive"). In *Lorraine*, Judge Paul W. Grimm discussed the "many ways" in which e-mail evidence may be authenticated:

"[E]-mail messages may be authenticated by direct or circumstantial evidence. An e-mail message's distinctive characteristics, including its 'contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances[,]' may be sufficient for authentication.

Printouts of e-mail messages ordinarily bear the sender's e-mail address, providing circumstantial evidence that the message was transmitted by the person identified in the e-mail address. In responding to an e-mail message, the person receiving the message may transmit the reply using the computer's reply function, which automatically routes the message to the address from which the original message came. Use of the reply function indicates that the reply message was sent to the sender's listed e-mail address.

The contents of the e-mail may help show authentication by revealing details known only to the sender and the person receiving the message.

E-mails may even be self-authenticating. Under Rule 902(7), labels or tags affixed in the course of business require no authentication. Business e-mails often contain information showing the origin of the transmission and identifying the employer-company. The identification marker alone may be sufficient to authenticate an e-mail under Rule 902(7). However, the sending address in an e-mail message is not conclusive, since e-mail messages can be

sent by persons other than the named sender. For example, a person with unauthorized access to a computer can transmit e-mail messages under the computer owner's name. Because of the potential for unauthorized transmission of e-mail messages, authentication requires testimony from a person with personal knowledge of the transmission or receipt to ensure its trustworthiness."

*Id.* at 554 (quoting JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL

EVIDENCE § 900.07[3][c] (Joseph M. McLaughlin ed., Matthew Bender 2d ed. 1997)).

Judge Grimm further noted:

Courts . . . have approved the authentication of e-mail by the above described methods. *See, e.g.*, [*United States v.*] *Siddiqui*, 235 F.3d [1318,] 1322-23 [(11th Cir. 2000)] (E-mail may be authenticated entirely by circumstantial evidence, including its distinctive characteristics); [*United States v.*] *Safavian*, 435 F.Supp.2d [36,] 40 [(D.D.C. 2006)] (recognizing that e-mail may be authenticated by distinctive characteristics 901(b)(4), or by comparison of exemplars with other e-mails that already have been authenticated 901(b)(3)); *Rambus* [*Inc. v. Infineon Technologies AG*], 348 F.Supp.2d 698 [(E.D.Va. 2004)] (E-mail that qualifies as business record may be self-authenticating under 902(11)); *In re F.P.*, 878 A.2d [91,] 94 [(Pa. Sup. Ct. 2005)] (E-mail may be authenticated by direct or circumstantial evidence).

*Id*. at 554-55.

## C.

### Specific E-mails at Issue

Appellant objects to the admission of numerous State's exhibits, collectively containing dozens of e-mails. He argues on appeal, as he did below, that these e-mails were unauthenticated and improperly admitted.[5] The exhibits at issue are as follows: (1) State's

_____

[5] Defense counsel argued below that the e-mails had not been authenticated as "coming from the source." He asserted: "If the computer expert can link it to [appellant],

(continued...)

-20-

Exhibit 23, admitted during Chief Manley's testimony, containing e-mails originating from several different addresses between April 20, 2011, and September 26, 2011, all but one of which were either sent or received by Chief Manley; (2) State's Exhibit 24, admitted during Detective Worsey's testimony, all of which were either sent or received by Detective Worsey; (3) State's Exhibit 57, admitted during Lieutenant Jones' testimony, containing e-mails originating from several different addresses between April 20, 2011, and October 2, 2011, all but two of which were either sent or received by Lieutenant Jones; (4) State's Exhibit 73, admitted during Detective Grapes testimony, containing e-mails originating from "Mr. Essex," that were all either received or sent by Detective Grapes between September 30, 2011, and October 4, 2011; and (5) State's Exhibits 28 through 54, admitted during Mr. Zeppos' testimony, each of which contained an e-mail, sent from a variety of different e-mail addresses between April 23, 2011, and October 3, 2011, to either Mr. Zeppos' personal work e-mail address or the e-mail address for Growlers that Mr. Zeppos monitored. As explained below, we agree with the circuit court that the e-mails were properly authenticated.

The most direct method of showing the authenticity of an e-mail is testimony by someone with personal knowledge that the evidence is what it is claimed to be, i.e., an e-mail sent to or from a particular person. Thus, the proponent could admit the e-mail through the

---

[5](...continued)
then they come in, just like a handwriting expert would testify that a letter is ascribed to a certain author, then they would all come in."

testimony of the author of the e-mail or a person who saw the author compose and send the e-mail. *See Devbrow v. Gallegos*, 735 F.3d 584, 587 (7th Cir. 2013). *Accord Lorraine*, 241 F.R.D. at 555 (one of "[t]he most frequent ways to authenticate email evidence" is through a "person with personal knowledge" pursuant to FED. R. EVID. 901(b)(1)); *Safavian*, 435 F. Supp. 2d at 42 (the author of an e-mail "may testify as to his or her personal knowledge of any particular e-mails he or she sent or received"); CHRISTOPHER B. MUELLER AND LAIRD C. KIRKPATRICK, 5 FEDERAL EVIDENCE § 9:9 (4th ed. 2012) ("A witness can authenticate an e-mail as one sent by that witness merely by identifying it as such.").

Here, many of the e-mails were admitted by direct evidence, i.e., through testimony of witnesses who were the authors of the e-mails. Specifically, Chief Manley, Detective Worsey, Detective Grapes, and Lieutenant Jones each testified regarding the content of e-mails that they authored and sent. Accordingly, these e-mails were properly authenticated by witnesses "with knowledge that the offered evidence is what it is claimed to be." Md. Rule 5-901(b)(1).

To be sure, many of the e-mails were not supported by direct evidence. As indicated, however, e-mails may be authenticated by circumstantial evidence that allows a finder of fact to determine that the e-mails are what the State claims them to be. *See United States v. Fluker*, 698 F.3d 988, 999 (7th Cir. 2012) ("Only a prima facie showing of genuineness is required; the task of deciding the evidence's true authenticity and probative value is left to the jury."); LYNN MCLAIN, MARYLAND EVIDENCE, § 901:1 (3d Ed. 2013) (an item "will be

properly authenticated if its proponent has offered foundation evidence that the judge finds would be sufficient to support a finding by a reasonable trier of fact that the item is what it is purported to be").

Maryland Rule 5-901(b)(4) gives examples of the type of circumstantial evidence that will authenticate evidence, "such as appearance, contents, substance, internal patterns, location, or other distinctive characteristics, that the offered evidence is what it is claimed to be."  Circumstantial evidence that has been used to authenticate e-mail messages includes forensic evidence connecting a computer to an internet address for the computer from which the e-mails were sent.  *Bobo v. State*, 285 S.W.3d 270, 275 (Ark. Ct. App. 2008).  Other circumstances have included an e-mail reference to the author with the defendant's nickname, where the context of the e-mail revealed details that only the defendant would know, and where the defendant called soon after the receipt of the e-mail, making the same requests that were made in the e-mail.  *Siddiqui*, 235 F.3d at 1322-23.

Here, there was sufficient circumstantial evidence authenticating the e-mails as being what the State claimed them to be, e-mails sent by appellant.  This evidence included e-mail addresses found on a paper in appellant's home and on his computer, as well as the common theme of the e-mails from various addresses.  We explain.

Starting with Exhibit 23, the following names and e-mail addresses, other than those used by Chief Manley, included:  (1) "Robert Fox" at "barsecurity123@gmail.com"; (2) "John Fox" at "barsecurity12345@gmail.com"; (3) "Mr. Tipster" at

"mrtpstr83@gmail.com"; (4) "Mr. Tipper" at "mrtipper008@gmail.com"; (5) "Henry Clay" at "hclay3508@gmail.com"; (6) "Mr. Tipper" at "mr.tipper@hotmail.com"; (7) "Mr Tipper" at "mrtppr48@gmail.com"; (8) "Mr. Tipper" at "mr.tipper2@hotmail.com"; (9) "Mr. Tipper" at "mrtipper2011111@hotmail.com"; (10) "Mr. Tipper" at "weedlocator@hotmail.com"; (11) "Stanley Skimmerhorn" at "stanleyskimmerhorn@yahoo.com"; and (12) "Mr. Essex" at "mr.essex@ymail.com."

As indicated, the name "Mr. Essex" was listed on a piece of paper found in appellant's basement. And Detective Heverly found a fragment of an e-mail from "Mr. Tipper" addressed to Chief Manley, as well as a Hotmail account for Mr. Tipper. Thus, these names, and the e-mails containing those names, were linked to appellant. Moreover, the context of the e-mails from Mr. Essex and Mr. Tipper linked all the other e-mails to appellant because they all referenced the same subject matter, a marijuana grow in State parks operated by the staff of Growlers. For example, the e-mail from John Fox, the name used after Robert Fox was abandoned, begins by stating: "I contacted you yesterday about a person I know who grows marijuana in Seneca Creek State Park, and Black Hills." Similarly, e-mails from "Mr. Tipster" and "Mr. Tipper" begin as follow, respectively: "I am the guy who's been contacting you about the marijuana grows in your park" and "I have been in touch with regard to the marijuana grows in the parks." The e-mail from Mr. Essex clearly tied it to the other e-mails, stating, in pertinent part, as follows: "Oh well. The cheese is all gone Mr. Manning. Maybe next year then. Perhaps by then you will have the money to afford my

-24-

help. . . . Zeppos is a little smarter than you, however, because you never got him. He did manage to harvest some of his weed, but not all of it." Given the circumstantial evidence tying the e-mails in Exhibit 23 to appellant, the circuit court did not abuse its discretion in determining that this Exhibit was properly authenticated.

The e-mails in State's Exhibit 24, which were sent to Detective Worsey, came from two named authors and addresses: (1) "Mr. Tipster" at "mrtpstr83@gmail.com"; and (2) "Mr. Tipper" at "mrtipper008@hotmail.com." The first e-mail contained information about Mr. Allen's involvement in cultivating marijuana in state parks and stated: "If you want the cheese to catch this rat you need to do something for me." A subsequent e-mail from "Mr. Tipster" demanded help for a "friend" whom Growlers' staff had "beat up" and then "had . . . busted."

Subsequent e-mails from "Mr. Tipster" referred to information that the author could provide as "the Cheese," similar to the final e-mail from "Mr. Essex" to Chief Manley. The last e-mail sent from the "mrtpstr83@gmail.com" address on May 4, 2011, began as follows: "Mr. Worsey, [d]ue to the length of time you are taking to respond, and our need for security, this e-mail address will no longer exist. . . . I'll be in touch through another email address in a week or two." On May 19, 2011, "Mr. Tipper" at "mrtipper008@gmail.com" e-mailed Detective Worsey, and stated: "I found the attorney's name for the guy we saw get set up by the Growlers['] security staff"; the end of the e-mail contained a link to the website of an attorney referred to in an e-mail to Chief Manley. Based on the information contained in the

previously admitted e-mails, and the clear similarities between the e-mails contained in Exhibit 23 and 24, there was sufficient circumstantial evidence to indicate that, not only was the author of the e-mails contained in both exhibits the same person, but that person was appellant.

Appellant next contends that the circuit court erred in admitting the e-mails to Mr. Zeppos. For the reasons discussed, *infra*, the circuit court did not abuse its discretion in admitting State's Exhibits 28 through 54 because there was sufficient circumstantial evidence to establish that the e-mails were sent by appellant.

State's Exhibit 57 consists of e-mails forwarded to, sent to, or sent by Lieutenant Jones. As indicated, Lieutenant Jones could authenticate the e-mails he sent. With respect to the other e-mails, we hold that there was sufficient circumstantial evidence to authenticate those e-mails as communications from appellant. Initially, several of the e-mails were sent by "Clayton Thomas III" at "cthomas03@hotmail.com." As indicated, "cthomas03@hotmail.com" was one of the e-mail addresses listed on the piece of paper seized from appellant's basement. This evidence was sufficient to authenticate these e-mails as coming from appellant. Moreover, the context of those e-mails, which referred to Growlers being "deeply involved in the drug trade," and offering to help "stop this group," involved the same subject matter as the other e-mails. There was sufficient circumstantial evidence to establish that the e-mails contained in Exhibit 57 were authenticated as being authored by appellant.

Finally, we turn to State's Exhibit 73. That exhibit contained an e-mail exchange between Detective Grapes and "Mr. Essex" at "mr.essex@ymail.com." As indicated, this e-mail address was found written on a piece of paper in a locked room in appellant's basement. The contents of the e-mails touched on the themes contained in e-mails to the other law enforcement officers, and they discussed Detective Grapes talking to the Montgomery County State's Attorney's office on behalf of the author's friend "Mike," who also went by the nickname "Montana," to have assault and drug charges against "Mike" dropped.[6]

Moreover, as indicated, three minutes after Detective Grapes sent out a call to the Drug Task Force on the police radio that he had found appellant's van, he received an e-mail from "Mr. Essex" stating that he could no longer work with Detective Grapes. Detective Grapes then sent out a second call indicating that the officers were to seize appellant's van, and appellant left his house and walked quickly toward his vehicle. The circuit court did not err in finding that State's Exhibit 73 was properly authenticated, as there was sufficient circumstantial evidence that appellant was the author of the e-mails contained therein.[7]

---

[6] As indicated, appellant stipulated that his nickname was "Montana."

[7] Even if an e-mail is authenticated, the e-mail is still subject to a challenge that the rule against hearsay prevents it from admission into evidence. *See Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 562 (D. Md. 2007). Appellant did not, for good reason, object to the admission of the e-mails on hearsay grounds. *See United States v. Siddiqui*, 235 F.3d 1318, 1323 (11th Cir. 2000) (e-mail by defendant not hearsay because not offered to prove
(continued...)

## II.

### Sufficiency of the Evidence

Appellant's next contention is that the evidence was insufficient to support his fifteen convictions for e-mail harassment. At the time the e-mails at issue were sent, Maryland Code (2002) § 3-805 of the Criminal Law Article ("C.L.") provided, in pertinent part, as follows:

> (a) *"Electronic mail" defined.* — In this section, "electronic mail" means the transmission of information or a communication by the use of a computer or other electronic means that is sent to a person identified by a unique address and that is received by the person.
> (b) *Prohibited.* — A person may not use electronic mail with the intent to harass:
> > (1) one or more persons;
> > (2) by sending lewd, lascivious, or obscene material.[8]

Appellant's sufficiency challenge is based solely on his claim that there was not sufficient evidence to show that he "was in fact the person sending messages to [Mr.] Zeppos." The State disagrees. It contends that the circumstantial evidence presented was sufficient to enable a rational trier of fact to find beyond a reasonable doubt that appellant was the author of the harassing e-mails sent to Mr. Zeppos.

The test of appellate review of evidentiary sufficiency is whether, "'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have

---

[7](...continued)
the truth of the substantive content and because it was an admission of a party opponent), *cert. denied*, 533 U.S. 940 (2001).

[8] As discussed *infra*, effective October 1, 2012, the language of the statute was changed.

found the essential elements of the crime beyond a reasonable doubt.'" *State v. Coleman*, 423 Md. 666, 672 (2011) (quoting *Facon v. State*, 375 Md. 435, 454 (2003)). The Court's concern is not whether the verdict is in accord with what appears to be the weight of the evidence, "but rather is only with whether the verdicts were supported with sufficient evidence -- that is, evidence that either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offense charged beyond a reasonable doubt." *State v. Albrecht*, 336 Md. 475, 479 (1994). "We 'must give deference to all reasonable inferences [that] the fact-finder draws, regardless of whether [the appellate court] would have chosen a different reasonable inference.'" *Cox v. State*, 421 Md. 630, 657 (2011) (quoting *Bible v. State*, 411 Md. 138, 156 (2009)). Further, we do not "'distinguish between circumstantial and direct evidence because [a] conviction may be sustained on the basis of a single strand of direct evidence or successive links of circumstantial evidence.'" *Montgomery v. State*, 206 Md. App. 357, 385 (quoting *Morris v. State*, 192 Md. App. 1, 31 (2010)), *cert. denied*, 429 Md. 83 (2012).

The convictions for e-mail harassment were based on the following e-mails and exhibits:

1. **State's Exhibit 28, Count 4:** Sent April 23, 2011, at 7:50 p.m. by "pleasuredaddy123456@gmail.com": You[r] security staff are all dirty, Alex. That is why Jason was arrested yesterday, and the rest of them will be arrested soon enough. I would get rid of Dunkin, and the rest of them ASAP, and hire new staff. Distance yourself from them while you can. Hire staff that do not try to rough up the customers, because if you try to rough up the wrong one, you may have more problems than you would

want, Alex. In fact, you're [sic] establishment may disappear over night. Then what would you do to make money?

2. **State's Exhibit 29, Count 5:** Sent April 24, 2011, at 10:36 a.m. by "pleasuredaddy123456@gmail.com": Alex, Birds of a feather, flock together. Your security staff is dealing drugs, and getting busted, Alex. I'd get rid of them before you get busted too. I heard your boy Jason was busted recently for marijuana at his house? I also heard that the cops, and the IRS are looking at you really strong now because they think you are the organizer. You need to disassociate yourself from your security staff, and get some new people who will not get you busted, and put in jail, Alex. From a friend who cares, Cheers

3. **State's Exhibit 30, Count 6:** Sent April 24, 2011, at 9:53 p.m. by "e.zbar@yahoo.com": Alex, I am hearing some very bad dudes talking down here about how you[r] security staff are dirty, and selling drugs, setting people up, etc. Don't e-mail me about this, as I will deny it all, but you need to know. I'm hearing that if you keep them around your establishment will not be around much longer. Up in smoke, if you know what I mean. Thought you might want to know what I am hearing from some connected guys I know.

4. **State's Exhibit 37, Count 14:** Sent August 15, 2011, at 9:19 p.m. by "Mr. Tipper" at "mr. tipper@yahoo.com": I was in your club on Saturday, and I overheard the guys at the next table talking about the fact that they worked for the Maryland Comptrollers [sic] Office located in Baltimore, MD. I did not pay much attention to the conversation until I heard one of them say that they would, **"Own the club after the audit is complete".** [sic] I am not sure what they were talking about, but thought you guys might want to know what I heard. I really do not know if I should be telling you this or not, or if I could get into trouble for doing so. You know how the IRS is. Only reason I am telling you this is because I visit you [sic] club weekly, and like place. [sic].

5. **State's Exhibit 38, Count 15:** Sent August 17, 2011, at 10:03 a.m. by "Mr. Greekdicker" at "jrkelly123@hotmail.com": I was asked if I had suggestions for a band that would be better than the ones you currently are using. I would give you a suggestion, but you would not be able to afford the band. I know what you offer the guys who play there, as I have talked to the band guys. You don't want to pay enough to get decent bands. If you would pay at least $500.00 a night you might get something decent.

6. **State's Exhibit 39, Count 16:** Sent August 18, 2011, at 7:04 a.m. by "Mr. Taxem" at "taxman86@hotmail.com," subject "Tax Evasion": I heard they were going to indict you . . .

7. **State's Exhibit 42, Count 19:** Sent August 27, 2011, at 6:49 p.m. by "Herman Sperman" at "backdoor.geeky.greeky.finder@hotmail.com," subject "Found You": I'm told you serve that backdoor greek salad after work. I hear there is no joy like a big gut greek boy.

8. **State's Exhibit 43, Count 20:** Sent August 31, 2011, at 10:59 p.m. by "Mr. Taxem" at "taxman86@gmail.com," subject "Tax Problems?": I hear you have some tax problems. From what I hear they are looking to pull your license to sell alcohol. Something about claiming food sales when they are actually alcohol sales. Tax structure is different too, so they are looking to get a lot of back taxes that you owe. Thought I would let you know. I am a patron, and I work for the IRS. I hear things.

9. **State's Exhibit 44, Count 21:** Sent September 5, 2011, at 8:50 p.m., by "Montanablues1 Blues" at "montanablues1blues@yahoo.com," subject "Caught You Didn't They?": I knew it was just a matter of time before the IRS got you.

10. **State's Exhibit 45, Count 22:** Sent September 7, 2011, at 1:44 a.m. by "Ms. Watcher" at "ms.watcher@ymail.com," Subject "Question": Are your cooks gay? They certainly act like they're gay. The fat one has a wiggle when he walks, and a giggle when he talks. I find it personally offensive. MW

11. **State's Exhibit 46, Count 23:** Sent September 9, 2011, at 10:36 p.m. by "Ms. Watcher" at "ms.watcher@ymail.com," subject "A Little Bird Told Me . . .": Heard the tax man was deep in your little tight Greek ass . . . Why don't you pay your taxes idiot. You wouldn't have this problem if you did.

12. **State's Exhibit 51, Count 28:** Sent October 1, 2011, at 8:13 a.m., by "The Bomb" at "thebomb00769@yahoo.de," subject "Your Club Sucks!!!": That is why people are not going there. It didn't take them long to figure out how much your place sucked. **You'll be like the End Zone in a minute.** (-: **Bankrupt City**

13. **State's Exhibit 52, Count 29:** Sent October 1, 2011, at 11:50 p.m. by "The Bomb" at "thebomb00769@yahoo.de": Tell that fag Greek His Pussy Stinks.

14. **State's Exhibit 53, Count 30:** Sent October 2, 2011, at 12:09 a.m. by "The Bomb" at "thebomb00769@yahoo.de": Your Club Sucks The Food Sucks The Music Sucks And We All Know The Cook Sucks a Mean One

15. **State's Exhibit 54, Count 31:** Sent October 3, 2011, at 5:29 a.m., by "Mr. yo Daddy" at "mr.yo_daddy@yahoo.com," subject "What A Dive": Dude, Your place is some shit! For real. Everything about it sucks . . . especially the funny fate [sic] cook with the pussy hair on his chin.

Appellant's contention that there was insufficient evidence for a jury to find that he was the sender of the e-mails is without merit. Initially, we note that ten of the e-mails at issue were sent from addresses that were written down on the piece of paper seized from appellant's basement. These addresses were as follows: "taxman86@hotmail.com," "ms.watcher@ymail.com," "jrkelly123@hotmail.com," "mr.yo_daddy@yahoo.com," "thebomb00769@yahoo.de," and "backdoor.geeky.greekyfinder@hotmail.com." Additionally, a Hotmail account for Mr. Tripper with respect to the e-mail from "mr.tipper@yahoo.com," was found in the hard drive of appellant's computer. Thus, there clearly was evidence connecting appellant to the 11 e-mails submitted from these addresses.

With respect to the remaining e-mails, which were from "pleasuredaddy12345@gmail.com," "e.zbar@yahoo.com," and "montanablues1blues@yahoo.com," the content of the e-mails provided sufficient circumstantial evidence for the jury to determine that appellant was the author. Specifically, the e-mails from "pleasuredaddy12345@gmail.com," sent on April 23 and 24, 2011, both

-32-

made claims that the security staff at Growlers was "dealing" and made reference to the arrest of the owner of the security company, Jason. The April 24, 2011, e-mail also referenced an IRS investigation at Growlers, a theme throughout the e-mails sent by "taxman86@gmail.com" and "Mr. Tipper." The e-mail from "e.zbar@yahoo.com," contained content very similar to the first e-mail from "pleasuredaddy12345@gmail.com"; both e-mails referenced the alleged involvement of Growlers' security staff with drugs, both insinuated that something might happen to Growlers (it "may disappear over night" and it "will not be around much longer"), and both referenced Growlers security staff interfering with customers. Finally, the e-mail address "montanablues1blues@yahoo.com," contained appellant's nickname, and it also referred to the IRS getting Growlers.

Given the connection between the e-mails and items found in appellant's house, as well as the content of the e-mails, the jury could conclude that appellant was the author of the 15 e-mails. The evidence was sufficient to support appellant's convictions of e-mail harassment.

### III.

### Merger of E-mail Harassment Convictions

Appellant contends that the circuit court erred in failing to merge his fifteen convictions for e-mail harassment. Specifically, he asserts that, under C.L. § 3-805, "the unit of prosecution is the pattern of harassing e-mails, not the individual e-mails," and therefore, the circuit court imposed an illegal sentence by imposing separate, consecutive

sentences for each conviction. In support, appellant argues that the e-mail harassment statute was "modeled off the telephone misuse statute," which this Court held, in *von Lusch v. State*, 39 Md. App. 517, 524, *cert. denied*, 283 Md. 740 (1978), prohibited a pattern of harassing phone calls, not individual calls. Additionally, he asserts that amendments to C.L. § 3-805 in 2012, which explicitly prohibit a "course of conduct," show the original intent "that the unit of prosecution [for e-mail harassment] is the same as that for telephone misuse: a pattern of harassment."

The State argues that the plain language of C.L. § 3-805 at the time of appellant's offenses makes clear that the unit of prosecution for a violation of the e-mail harassment statute is one e-mail. It asserts that, because there is no ambiguity in the language in the statute, appellant's reliance on legislative history to support his argument is misplaced.

"The key to the determination of the unit of prosecution is legislative intent." *Moore v. State*, 198 Md. App. 655, 680 (2011). *Accord Purnell v. State*, 375 Md. 678, 692 (2003) ("'whether a particular course of conduct constitutes one or more violations of a single statutory offense . . . turn[s] on the unit of prosecution of the offense and this is ordinarily determined by reference to legislative intent'") (quoting *Brown v. State*, 311 Md. 426, 432 (1988)). In determining legislative intent, we look "'first to the words of the statute, read in light of the full context in which they appear, and in light of external manifestations of intent or general purpose available through other evidence.'" *Moore*, 198 Md. App. at 680 (quoting *Cunningham v. State*, 318 Md. 182, 185 (1989)). In doing so, we "'must always be cognizant

-34-

of the fundamental principle that statutory construction is approached from a "commonsensical" perspective. Thus, we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense.'" *Della Ratta v. Dyas*, 414 Md. 556, 567 (2010) (quoting *Frost v. State*, 336 Md. 125, 137 (1994)).

"If the statutory language is unambiguous when construed according to its ordinary and everyday meaning, then [we] 'will give effect to the statute as it is written,' and we will not add or delete words from the statute." *Melton v. State*, 379 Md. 471, 477 (2004) (citation omitted). "Only if the statutory language is ambiguous will [we] look 'beyond the statute's plain language in discerning the legislative intent.'" *Id.* (quoting *Comptroller of the Treasury v. Clyde's of Chevy Chase, Inc.*, 377 Md. 471, 483 (2003)).

As indicated, at the time that appellant committed the offenses, and at the time of his trial and sentencing, C.L. § 3-805(b) prohibited the use of "electronic mail with the intent to harass: (1) one or more persons; (2) by sending lewd, lascivious, or obscene material." The statute defined "electronic mail" as "the transmission of information or a communication by the use of a computer or other electronic means that is sent to a person identified by a unique address and that is received by the person." C.L. § 3-805(a). A person who violated this section was "guilty of a misdemeanor" and "subject to imprisonment not exceeding 1 year or a fine not exceeding $500 or both." C.L. § 3-805(e).

Pursuant to the language of the statute, the unit of prosecution is "*the transmission of information* or *a communication*." C.L. § 3-805(a) (emphasis added). Neither of these terms

-35-

are defined in the statute, so we look to the dictionary definitions of these terms. *See Lowery v. State*, 430 Md. 477, 491 (2013) ( where "the terms are not defined by the statute . . . we turn to a dictionary that is contemporaneous with the drafting and enacting of the language in the statute giving rise to the obligation"); *Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 447 (1997) ("Although dictionary definitions do not provide dispositive resolutions of the meaning of statutory terms . . . 'dictionaries . . . do provide a useful starting point for determining what statutory terms mean, at least in the abstract, by suggesting what the legislature could have meant by using particular terms.'") (quoting NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 47.28 (1996 Supp.)).

Transmission is defined as "an act, process, or *instance* of transmitting. MERRIAM WEBSTER COLLEGIATE DICTIONARY 1255 (10th Ed. 1999) (emphasis added). Communication is defined as "an act or instance of transmitting," "information communciated," and "a verbal or written message." *Id*. at 233. Both terms contemplate one instance, i.e., a singular act.

When the General Assembly intends to make the unit of prosecution a course of conduct, it has made that intent clear. For example, two statutes in effect at the time the e-mail statute was enacted in 1998[9] specifically referred to "repeated calls" or a "course of conduct." *See* Md. Code (1996 Repl. Vol.) Art. 27 § 555A (prohibiting the use of telephone

---

[9] The statutory provision governing the "misuse of electronic mail" was enacted in 1998, as § 555C of Article 27, and was then recodified "without substantive change" as Md. Code (2002) § 3-805 of the Criminal Law Article ("C.L.").

facilities to make repeated calls with the intent to harass); Md. Code (1996 Repl. Vol.) Art. 27 § 121A (prohibiting a person from engaging in a "course of conduct that alarms or seriously annoys another person" with the intent to harass that person). The legislature did not use this language in the statute prohibiting harassment by electronic mail.

We agree with the State that the language of the statute here is unambiguous. Accordingly, it is not appropriate to infer a different meaning based on the legislative history. *See Coleman v. State*, 281 Md. 538, 546 (1977) ("a court may not as a general rule surmise a legislative intention contrary to the plain language of a statute or insert exceptions not made by the legislature").

We may, however, "'[i]n the interest of completeness . . . look at the purpose of the statute and compare the result obtained by use of its plain language with that which results when the purpose of the statute is taken into account.'" *Smith v. State*, 399 Md. 565, 578 (2007) (quoting *Harris v. State*, 331 Md. 137, 146 (1993)). In this instance, our "resort to legislative history is a confirmatory process; it is not undertaken to seek contradiction of the plain meaning of the statute." *Id*.

The legislative history of C.L. § 3-805 makes clear, as appellant contends, that the intent of House Bill 140 was to create legislation relating to e-mails that was similar to the telephone misuse statute. *See, e.g.*, Senate Judicial Proceedings Committee, Senate Bill 222, Synopsis (Feb. 24, 1998) ("This legislation simply treats e-mail in the same manner that Article 27 treats telephone communication."); House Judiciary Committee, Bill Analysis,

House Bill 140 ("While Art. 27, 555A prohibits a person from using telephone facilities or equipment for harassing another person, this bill is intended to prohibit harassment through e-mail communications.").

The initial version of the statute contained language virtually identical to that of the telephone misuse statute in effect at the time, in that it prohibited the use of electronic mail:

> (1) for an anonymous communication if in a manner reasonable to be expected to annoy, abuse, torment, harass, or embarrass one or more persons; or
> (2) for repeated communications, if with intent to annoy, abuse, torment, harass, or embarrass one or more persons; or
> (3) for any comment, request, suggestion or proposal which is obscene, lewd, lascivious, filthy, or indecent, if with intent to annoy, abuse, torment, harass, or embarrass one or more persons.[10]

During the amendment process, however, the language of House Bill 140 was changed to replace "repeated communications" with "a communication." *See* Conf. Comm., Amdt. to House Bill No. 140 (Apr. 13, 1998). The version of § 555C ultimately enacted in 1998 provided as follows:

> (c) A person may not use electronic mail for *a communication* with intent to harass:
> (1) one or more persons; or
> (2) by sending lewd, lascivious, or obscene material.

---

[10] Maryland Code, Art. 27 (1996 Rep. Vol.) § 555A provided: "It is unlawful for any person to make use of telephone facilities or equipment (1) for an anonymous call or calls if in a manner reasonably to be expected to annoy, abuse, torment, harass, or embarrass one or more persons; (2) for repeated calls, if with intent to annoy, abuse, torment, harass, or embarrass one or more persons; or (3) for any comment, request, suggestion or proposal which is obscene, lewd, lascivious, filthy, or indecent."

(Emphasis added).[11]

This legislative history indicates that the intent of the legislature in 1998 was that *a communication*, a single e-mail, was the unit of prosecution under the statute. *Pleasants Investments Ltd. P'ship v. Dep't of Assessments & Taxation*, 141 Md. App. 481, 494, 497-99 (2001) (noting that "the indefinite article 'a' is implied to mean 'one' or 'each,' subject to context"). The legislative history confirms our interpretation of the plain language of the statute that the unit of prosecution under this statute is one e-mail.

Appellant argues, however, that a more recent amendment to the statute indicates otherwise. As appellant notes, the General Assembly amended C.L. § 3-805, effective on October 1, 2012, to provide:

> (b) *Prohibited*. — (1) A person may not maliciously *engage in a course of conduct*, through the use of electronic communication, that alarms or seriously annoys another:
>> (I) with the intent to harass, alarm, or annoy the other;
>> (ii) after receiving a reasonable warning or request to stop by or on behalf of the other; and
>> (iii) without a legal purpose.

---

[11] In 2002, Art. 27 § 555C was recodified "without substantive change" as C.L. § 3-805. The Revisor's Note to the Acts of 2002, chapter 26, provided that, although "the former references to 'a communication' and 'communications' are deleted as included in the definition of 'electronic mail,'" the new language is derived "without substantive change from former Art. 27, § 555C." *See Comptroller of Treasury v. Blanton*, 390 Md. 528, 538 (2006) (Recodification "'of statutes is presumed to be for the purpose of clarity rather than change of meaning,'" and therefore, "'even a change in the phraseology of a statute by a codification will not ordinarily modify the law unless the change is so radical and material that the intention of the Legislature to modify the law appears unmistakably from the language of the Code.'") (quoting *Md. Div. of Labor and Industry v. Triangle Gen. Contractors, Inc.*, 366 Md. 407, 422 (2001)).

-39-

C.L. § 3-805 (2013 Supp.) (emphasis added).

The legislative history for Senate Bill 175, the bill seeking to amend § 3-805[12] indicates that the purpose for the amendment was to broaden the scope of the statute to include text messages, internet postings, and other forms of electronic exchange, and therefore, the term "electronic mail" was changed to "electronic communication." *See, e.g.*, Letter from Women Legislators of the Maryland General Assembly, Inc. to Brian E. Frosh, Chair, Judicial Proceedings Committee (Feb. 8, 2012) (expressing support for SB 175, which was "intended to modernize Maryland's existing electronic harassment statute, to include modes of communication other than electronic mail"); Letter from Governor's Office of Crime Control and Prevention to Brian E. Frosh, Chair, Judicial Proceedings Committee (Feb. 2, 2012) ("By expanding the crime of harassment to encompass electronic communication, the law is now able to expose criminals and prosecute crimes involving text messaging, social networking, website publications and any other form of electronic exchange as a type of harassment").

---

[12] Senate Bill 175 proposed changing § 3-805(b) as follows:

(b) A person may not [use] **ENGAGE IN** electronic [mail] **COMMUNICATION** with the intent to harass:

(1) one or more persons; or

(2) by sending lewd, lascivious, or obscene material.

-40-

The American Civil Liberties Union of Maryland ("ACLU") subsequently opposed SB 175. It argued that the statute, as written, "provide[d] no definition of or limitations on the applicability of the term 'harass,' thereby leaving the decision of what constitutes harassment in the discretion of police and prosecutors, without guidance to Maryland residents." Testimony [of the ACLU] for the Senate Judicial Proceedings Committee (Feb. 2, 2012). It distinguished C.L. § 3-803, "Harassment," which required the State "to prove that defendant engaged 'in a persistent pattern of conduct, composed of a series of acts over a period of time' that 'alarms or seriously annoys another person . . . after reasonable warning or request to desist by or on behalf of the other person.'" *Id*.[13] The General Assembly then amended the proposed change to C.L. § 3-805 to mirror the language in § 3-803. Nothing in the legislative history of the 2012 amendment to C.L. § 3-805 indicates an intent to clarify existing law.

---

[13] C.L. § 3-803 provides, in pertinent part, as follows:

(a) A person may not follow another in or about a public place or maliciously engage in a course of conduct that alarms or seriously annoys the other:
   (1) with the intent to harass, alarm, or annoy the other;
   (2) after receiving a reasonable warning or request to stop by or on behalf of the other; and
   (3) without a legal purpose.

Accordingly, we hold that the unit of prosecution for e-mail harassment, prior to the 2012 amendment, was each e-mail sent. This holding is based on the plain language of the statute, which is supported by the legislative history.[14]

Contrary to appellant's argument, the rule of lenity does not require merger of his convictions. As the Court of Appeals has explained, when legislative intent can be determined, "that intent will be enforced, and the concept of lenity does not become an operable factor." *Richmond v. State*, 326 Md. 257, 269 (1992). "Since the legislative intent is clear, the rule of lenity is inapplicable." *Id*. The circuit court properly imposed separate sentences for each of the convictions of electronic mail harassment.

## IV.

### Closing Argument

Appellant contends that the circuit court abused its discretion "by impermissibly limiting defense counsel's closing argument." He asserts that the court "quashed defense counsel's legitimate efforts to attack the credibility of [Mr.] Allen and others working at or for Growlers," and in doing so, violated his right to a fair trial. Specifically, he argues that the court invaded the province of the jury by: "(1) dismissing the significance of

---

[14] The change in the statute, effective October 1, 2012, does not impact appellant's sentence. *See State v. Johnson*, 285 Md. 339, 345 (1979) (law at the time of trial and sentencing is controlling because the general savings clause, Md. Code (2011 Repl. Vol.) Art. 1 § 3, has the effect of "saving any penalty, forfeiture or liability incurred under a statute which is subsequently repealed or amended unless the repealing act expressly provides otherwise").

[Mr.] Allen's prior conviction, and (2) by inhibiting comment on possible illicit activities engaged in by Grow[l]ers, where an important question for the jury was whether the anonymous allegations against the establishment were actually false."

The State argues that "the trial court properly confined defense counsel's closing argument to the evidence presented at trial and to the facts and inferences that may be drawn from the evidence." Moreover, it asserts that, despite the State's numerous objections, "the record evidences that the court's rulings failed to curtail defense counsel's argument," as "defense counsel ignored the court's rulings and simply refused to stop making the improper argument."

The Court of Appeals discussed the boundaries of permissible closing argument in *Wilhelm v. State*, 272 Md. 404, 412-13 (1974):

> As to summation, it is, as a general rule, within the range of legitimate argument for counsel to state and discuss the evidence and all reasonable and legitimate inferences which may be drawn from the facts in evidence; and such comment or argument is afforded a wide range. Counsel is free to use the testimony most favorable to his side of the argument to the jury, and the evidence may be examined, collated, sifted and treated in his own way. Moreover, if counsel does not make any statement of fact not fairly deducible from the evidence his argument is not improper, although the inferences discussed are illogical and erroneous. Generally, counsel has the right to make any comment or argument that is warranted by the evidence proved or inferences therefrom; the prosecuting attorney is as free to comment legitimately and to speak fully, although harshly, on the accused's action and conduct if the evidence supports his comments, as is accused's counsel to comment on the nature of the evidence and the character of witnesses which the (prosecution) produces. . . .
>
> While arguments of counsel are required to be confined to the issues in the cases on trial, the evidence and fair and reasonable deductions therefrom,

and to arguments of opposing counsel, generally speaking, liberal freedom of speech should be allowed. There are no hard-and-fast limitations within which the argument of earnest counsel must be confined – no well-defined bounds beyond which the eloquence of an advocate shall not soar. He may discuss the facts proved or admitted in the pleadings, assess the conduct of the parties, and attack the credibility of witnesses. He may indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions.

Although "attorneys are afforded great leeway in presenting closing arguments to the jury," *Degren v. State*, 352 Md. 400, 429 (1999), there are limits on the scope of a proper closing argument. Counsel is not permitted "to state and comment upon facts not in evidence," *Wilhelm*, 272 Md. at 413, and comments "that invite the jury to draw inferences from information that was not admitted at trial" are improper." *Lee v. State*, 405 Md. 148, 166 (2008).

The determination and scope of closing argument is within the sound discretion of the trial court. *Wise v. State*, 132 Md. App. 127, 142, *cert. denied*, 360 Md. 276 (2000). An appellate court should not "interfere with that judgment unless there has been an *abuse of discretion* by the trial judge of a character likely to have injured the complaining party.'" *Washington v. State*, 180 Md. App. 458, 473 (2008) (quoting *Wilhelm*, 272 Md. at 413).

Here, during defense counsel's closing argument, he attempted to raise questions regarding the credibility of Growlers' employees. The argument proceeded as follows:

> We do know that [appellant] was beaten up because Jason Fair testified that he came home from that incident with injuries. So we know that something happened. And we also know, and I'm going to get back to this in a second when I impeached, that means caught in a lie, Mr. Zeppos about his involvement in whatever happened that caused those injuries. What happened at Growlers? Well, we don't know.

-44-

But is Growlers a place where you can buy marijuana if you're a patron? Just asking a question. Do the bouncers up there have a little side business going on where they sell marijuana? Could be. So what's happening at Growlers is not defined.

Now, ask yourself some questions. If Growlers people, and that includes this group of security staff or bouncers, they bounce people right out. Let's say something is happening up at Growlers a little bit on the side. Let's say they meet an older guy who happens to be a very, very talented gardener, someone with expertise in horticulture, someone who can grow herbs, spices, plants, tropical plants, exotic plants, someone who really knows how to do it.

Maybe Growlers younger guys are interested in recruiting somebody into helping them with their conspiracy, or their side business.

[PROSECUTOR]: Objection.

THE COURT: Sustained.

[DEFENSE COUNSEL]: These are questions that you may want to ask yourself based upon the evidence in this case. Based upon the evidence that you've heard in this case, you may have some questions about what happened up there. And did something happen that, you know, was it a little scheme or plot hatched in order to plant some marijuana?

[PROSECUTOR]: Objection.

THE COURT: Sustained.

[DEFENSE COUNSEL]: We know that there is a lot of talk about marijuana grows. That we know. And I don't think anyone will object to that. But you have to ask yourself what's really going on here, and who knew what, and why did, why did [appellant] get beaten up?

[PROSECUTOR]: Objection.

THE COURT: Sustained.

The colloquy above shows that the court did not, as appellant asserts, "deflat[e] defense counsel's argument about possible illicit activities conducted by Growlers." Rather, the court merely controlled the scope of the argument to the issues at trial. The court sustained the State's objection to defense counsel's speculation about the incident at Growlers on April 10, 2011, and whether the security staff at Growlers had solicited appellant with respect to marijuana, issues that were not before the jury. The court did not abuse its discretion in controlling the scope of argument in this regard.

The next portion of closing argument at issue on appeal involves arguments regarding Mr. Allen. The argument at issue is as follows:

> [DEFENSE COUNSEL]: The only marijuana that we've actually seen or heard testimony of that anyone had was on Allen's property. Inside, outside. And now let's talk about, let's talk a little about Mr. Allen's character. Who is the only person that you heard from this whole week who was impeached by a prior conviction?[15] That's one of the instructions. The only witness, and you've got an instruction specifically on that, 322, impeachment by prior conviction.
>
> You have heard evidence that Jason Allen has been convicted of a crime. And what was that crime? Does anyone remember? Did you write that down? Impersonating a police officer. Pretending to be somebody you're not. Taking on a false identity. What kind of person is convicted of that crime? He has got to be a dishonest person, deceitful, deceptive –
>
> [PROSECUTOR]: Objection.
>
> THE COURT: Sustained.

---

[15] At trial, Mr. Allen acknowledged that in 2001 he pled guilty to impersonating a police officer.

At that point, the prosecutor asked the court to approach the bench. He argued that, although defense counsel had a lot of leeway during argument, counsel was "going overboard." He asked the court to "strike the statements . . . elaborating on about what sort of dishonest person would do that. It's improper." The court agreed that what defense counsel was "saying about Mr. Allen. . . . I think that's a little bit extreme." It stated that counsel could argue that "his veracity is in question and so on, but not the extreme that you were going to."

Counsel then continued his closing argument, making the following remarks with respect to Mr. Allen:

> This man was convicted, convicted of impersonating a police officer. You can consider that when it comes to the truthfulness of his testimony, and that is exactly what the pattern jury instruction says. You may consider this evidence in deciding whether the witness is telling the truth. Right there. You're going to get a copy of that.

> So, was he telling the truth when those police officers banged on his door about the marijuana? Was he telling the truth about smoking marijuana inside his house? Question mark. That's up to you to decide.

Based on the above, we disagree with appellant's assertion that the court "quashed defense counsel's legitimate efforts to attack the credibility of Jason Allen." We perceive no abuse of discretion by the trial court in controlling the scope of defense counsel's closing argument.

## V.

### Admissibility of Message Found in Appellant's Basement

Appellant's next contention addresses a typed message recovered from appellant's locked room in the basement of his house. The message stated:

Al,

Here is your order of Virginia Prime Shake (Table Cuttings). If you need any more let us know. We should have this in supply until January or February.

Sorry to hear about your crops that got ripped off this fall. Thank God you did find some unharmed. Someone on the **inside** must have helped these guys rob you, Al. Don't worry, I can fill the supply void for you until spring.

Dean Cook

Appellant argues that the circuit court erred in admitting the message into evidence. Specifically, he contends that it was irrelevant and "constituted inadmissible bad-acts evidence." We will address each of these contentions.

## A.

### Relevance

Appellant contends that the message was irrelevant because it was not clearly linked to other evidence in the case. Specifically, he asserts that the name "Dean Cook" was not linked with any other evidence, the name "Al" was mentioned only once, in an e-mail to Growlers that dealt with a different subject matter, and "Virginia Prime Shake" was not described to be a known entity. Accordingly, appellant contends that "the exhibit as a whole failed to make any fact of consequence more or less probable," and therefore, the exhibit "should have been excluded as irrelevant."

The State disagrees, stating that "[t]he relevance of the exhibit is patent." It argues that the exhibit was consistent with e-mails sent to Detective Grapes and Lieutenant Jones, and therefore, it was relevant to establish that appellant was the author of those e-mails.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401. "[T]he relevancy determination is not made in isolation. Instead, the test of relevance is whether, in conjunction with all other relevant evidence, the evidence tends to make the proposition asserted more or less probable." *Snyder v. State*, 361 Md. 580, 592 (2000).

As the Court of Appeals explained in *Simms*, we review a trial court's decision to admit evidence for abuse of discretion, but we conduct an independent analysis of whether evidence is relevant:

> It is frequently stated that the issue of whether a particular item of evidence should be admitted or excluded "is committed to the considerable and sound discretion of the trial court," and that the "abuse of discretion" standard of review is applicable to "the trial court's determination of relevancy." Maryland Rule 5-402, however, makes it clear that the trial court does not have discretion to admit irrelevant evidence. . . . [T]he "de novo" standard of review is applicable to the trial judge's conclusion of law that the evidence at issue is or is not "of consequence to the determination of the action."

420 Md. at 724-25 (quoting *Ruffin Hotel Corp. of Md. v. Gasper*, 418 Md. 594, 619-20 (2011)) (citations omitted).

Here, the message was relevant to connect appellant as the author of the e-mails to Lieutenant Jones and Detective Grapes, a fact of consequence to determining appellant's

guilt with respect to: (1) the charge of false statement to Lieutenant Jones; and (2) the charge of obstruction of justice, based on appellant's e-mails to Detective Grapes attempting to broker a deal for himself in the case stemming from the April 10, 2011, incident at Growlers. The message, allegedly from a marijuana supplier in Virginia, connects appellant with the emails sent to Lieutenant Jones from "Clayton Thomas III." E-mails sent in September 2011 informed Lieutenant Jones that Growlers "receive[s] marijuana shipments at the bar from growers in VA to blend with their marijuana" and offered to provide tracking numbers for the shipments. An e-mail to Lieutenant Jones in October 2011 asserted that "Zeppos was ripped off for a lot of his harvest, and will be buying from some growers out of Virginia."

The message also connects appellant with the September e-mails to Detective Grapes from "Mr. Essex," which also stated that Growlers "receive[s] shipments of marijuana from a grow operation in Virginia" and offered to provide Detective Grapes with information about the shipment in exchange for the charges against his "friend" being dropped. Because the message contained content consistent with e-mails sent to Lieutenant Jones and Detective Grapes, it had a tendency to prove appellant's identity as the author of these e-mails. The circuit court did not err in determining that the message was relevant evidence.

**B.**

**Bad Act Evidence**

Appellant next contends that the court erred in admitting the message because it was inadmissible bad acts evidence. He argues that the court erred in admitting the message because its probative value was substantially outweighed by unfair prejudice.

The State argues that this contention is not preserved for our review because appellant did not object below that the message constituted alleged bad acts evidence. We agree. *See* Md. Rule 8-131(a) ("Ordinarily, the appellate court will not decide [an] issue unless it plainly appears by the record to have been raised in or decided by the trial court.").

In any event, even if preserved, we would find the argument to be without merit. Maryland Rule 5-404(b) provides as follows:

> (b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

Pursuant to this Rule, "[p]ropensity evidence, or evidence suggesting that because the defendant is a person of criminal character it is more probable that he committed the crime for which he is on trial, is not admissible into evidence." *Wagner v.* State, 213 Md. App 419, 458 (2013) (quoting *Hurst v. State*, 400 Md. 397, 407 (2007)). Evidence of other crimes may be admissible, however, if the evidence has "'special relevance, i.e. is substantially relevant to some contested issue in the case and is not offered simply to prove criminal character.'" *Id.* (quoting *Hurst*, 400 Md. at 408).

To determine the admissibility of other crimes evidence, the court must engage in a three-step analysis. *State v. Westpoint*, 404 Md. 455, 489 (2008). First, the evidence must

fall within one of the exceptions listed in Rule 5-404(b), or otherwise have special relevance to some contested issue in the case. *Id*. Second, after determining whether the contested evidence falls within an exception to the general bar on the use of other crimes evidence, the court must find that the accused's involvement in the other crimes is established by clear and convincing evidence. *Id.* Third, if that requirement is met, the trial court then must weigh the necessity for, and probative value of, the other crimes evidence against any undue prejudice likely to result from its admission. *Id.*

As indicated, the message here was relevant to appellant's identity as the author of the e-mails that were the subject of the charges against him. And we are not persuaded that any prejudice from the admission of the message outweighed its probative value.[16] Accordingly, the circuit court did not abuse its discretion in admitting the message.

## VI.

## Voice Identification

Appellant's next contention is that the circuit court abused its discretion by allowing several witnesses to identify his voice. Specifically, Officer Hollis testified that he recognized appellant's voice on the taped 911 call reporting that Mr. Allen was growing and selling marijuana and that marijuana could be found in front of his home. Mr. Fair and Detective Grapes also testified that they recognized appellant's voice as the narrator in the

---

[16] Appellant does not argue that there was not clear and convincing evidence showing his involvement with the message.

videotape found in appellant's basement, which addressed how to cultivate marijuana plants. Appellant argues that this testimony was inadmissible "because, prior to the in-court identifications, the State failed to lay an adequate foundation as to the reliability of the identifications."

The State disagrees. It contends that the circuit court "properly exercised its discretion when it allowed witnesses familiar with [appellant's] voice to identify [his] voice."

As indicated, Md. Rule 5-901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." With respect to voice identifications, the Rule provides, "[b]y way of illustration only," the following examples of authentication: "Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, based upon the witness having heard the voice at any time under circumstances connecting it with the alleged speaker." Md. Rule 5-901(b)(5).

In *Hopkins v. State*, 352 Md. 146, 158 (1998), the Court of Appeals addressed, for the first time, the admissibility of in-court voice identification evidence. The Court stated that the issue generally was left to the discretion of the trial court. *Id.* In exercising this discretion, however, the court must assess whether the evidence is relevant and reliable. *Id.* at 159.

Appellant's sole contention here involves the reliability of the evidence. Reliability is assessed using the five-factor test set forth by the Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199 (1972): "(1) the ability of the witness to hear the assailant speak, (2) the witness's degree of attention, (3) the accuracy of any prior identifications the witness made, (4) the period of time between the incident and the identification, and (5) how certain the witness was in making the identification." *Hopkins*, 352 Md. at 160-61.

In *Hopkins*, the circuit court permitted the State to obtain a voice exemplar from Hopkins, asking Hopkins to say something the person who robbed the victim said to her. *Id*. at 152-53. The victim identified Hopkins' voice as that of her assailant, who had made several demands of her during the course of the robbery. *Id*. at 150, 152. The Court of Appeals held that the identification "was sufficiently reliable," noting that, although nine months had passed between when the victim heard the perpetrator's voice and the trial, this period of time was not too lengthy. *Id*. at 166, 169. It further noted that the victim had heard the perpetrator "say many things," he spoke close to where she stood, and the victim stated that the perpetrator was "articulate," such that "[h]er identification of [Hopkins'] voice was based, at least in part, on this distinctive aspect of his speech." *Id*. at 164-65.

Here, Officer Hollis testified that, after listening to a recording of the 911 call, he recognized appellant's voice. Officer Hollis' ability to identify appellant's voice was based on his 15-minute conversation with appellant after he pulled over appellant's vehicle, and the five-to ten-minute conversation he had with appellant at appellant's residence later that

evening. These conversations took place an hour before Officer Hollis's identification, and he expressed no hesitancy in his identification. That Officer Hollis did not comment on distinct characteristics about appellant's voice does not render the identification unreliable. The circuit court did not abuse its discretion in admitting this identification into evidence.

Mr. Fair's identification of appellant's voice from the video discussing how to grow and transplant plants also was reliable. Mr. Fair had lived with appellant for a year, and during that time, appellant had invited him to spend time in his basement room and to smoke marijuana, and the two had engaged in extensive discussions regarding the return of Mr. Fair's security deposit. The record contained ample evidence that two interacted on numerous occasions, and the circuit court did not abuse its discretion in admitting this identification.

Detective Grapes' testimony identifying the voice narrating the video as that of appellant similarly was reliable.[17] Detective Grapes testified that he spoke to appellant for twenty minutes on October 4, 2011, when he placed him under arrest, and he spoke to appellant for another twenty minutes at the police station. Moreover, the court stated that there was "some type of an intonation" in the video that the court "thought was rather distinctive." Under these circumstances, the court did not abuse its discretion in admitting this testimony identifying appellant's voice.

**VII.**

---

[17] Detective Grapes testified at trial that the voice "sounds like [appellant] to me."

**Expert Testimony**

Appellant argues that the circuit court "abused its discretion in accepting Detective Heverly as an expert in digital forensic examinations." He contends that the State failed to establish that Detective Heverly had the requisite qualifications to give expert testimony. The State argues that the record contained "ample evidence" of Detective Heverly's qualifications, and the court acted within its discretion in qualifying him as an expert.

"Generally, a trial court has 'wide latitude in deciding whether to qualify a witness as an expert or to admit or exclude particular expert testimony.'" *Shemondy v. State*, 147 Md. App. 602, 611 (2002) (quoting *Massie v. State*, 349 Md. 834, 850-51 (1998)), *cert. denied*, 373 Md. 408 (2003). *Accord MEMC Elec. Materials, Inc. v. BP Solar Int'l, Inc.*, 196 Md. App. 318, 355 (2010). The admissibility of expert testimony is within the discretion of the trial court, and therefore, the circuit court's decision to admit expert testimony "will seldom constitute a ground for reversal." *Bryant v. State*, 393 Md. 196, 203 (2006).

Pursuant to Md. Rule 5-702, "[e]xpert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." The court must assess various factors in that regard, including: "(1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert

testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony." *Id.*

Here, appellant's challenge is to Detective Heverly's qualifications. "'To qualify as an expert, one need only possess such skill, knowledge, or experience in that field or calling as to make it appear that [the] opinion or inference will probably aid the trier [of fact] in his search for the truth.'" *Morton v. State*, 200 Md. App. 529, 545 (2011) (quoting *Thanos v. State*, 330 Md. 77, 95, (1993)).

Detective Heverly testified that he had completed more than 240 hours of training in computer forensics, as a result of which he had been "certified by the Department of Defense as a computer forensic examiner." He was a member of the "National White Collar Crime Center," the "International Association of Computer Investigative Specialists," the Department of Defense "Cyber Investigative Training Academy," and he was a deputized member of the "United States Secret Service, Washington Metro Electronic Crimes Task Force." In addition, he took a Windows Forensic Examinations course and a mobile forensic examination course for cell phones, GPS, and other mobile devices.

Although Detective Heverly did not have post-graduate degrees in computer science, and he had not testified previously, the qualifications he did have supported the circuit court's decision to accept him as an expert witness. There was no abuse of discretion.

## VIII.

## Motion for a New Trial

Appellant's final contention is that the circuit court erred in denying his *pro se* motion for a new trial. He asserts that the motion "was based in part upon [his] contention that he learned on March 9, 2012, two days after the verdict, that the State did not, as part of its discovery obligations, disclose an exculpatory e-mail message and no longer possessed the e-mail message." He does not explain the context of the e-mail, or how the court prevented him "from fully developing the issue at the June 18 hearing." Instead, he merely asserts that he "preserves for further review" his contention that the circuit court abused its discretion in denying his motion.

Because appellant has not presented sufficient legal or factual argument for this Court to address this claim, we decline to consider it. *See Bradley v. Hazard Tech. Co., Inc.*, 340 Md. 202, 206 (1995) (appellant bears burden of establishing error in the lower court); *Honeycutt v. Honeycutt*, 150 Md. App. 604, 618, *cert. denied*, 376 Md. 544 (2003) (where a party does not adequately brief an argument, appellate court need not address it); *Van Meter v. State*, 30 Md. App. 406, 408 (appellate court cannot be expected to delve through the record to unearth factual support favorable to appellant and then seek out law to sustain his position), *cert. denied*, 287 Md. 737 (1976).

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**